Iowa Farm Credits Company, Appellant, v. Peoples Savings Bank of Menlo, Appellee.

**CHATTEL MORTGAGES: Conversion — Receipt of Proceeds.** The fact that a party received the proceeds of mortgaged chattels does not, in and of itself, constitute a conversion of such chattels.

*Appeal from Guthrie District Court.—J. H. APPLEGATE, Judge.*

MARCH 6, 1923.

REHEARING DENIED NOVEMBER 20, 1923.

PLAINTIFF, as mortgagee of Charles E. Smith, brings this action against the Peoples Savings Bank of Menlo, to recover the amount due it from Smith under said mortgage, upon the theory that defendant aided, instigated, and abetted Smith in the sale and conversion of the mortgaged property. A motion to direct a verdict, made at the close of plaintiff's testimony, was sustained by the court. Plaintiff appeals.—*Affirmed.*

*Witter & Ryan* and *Weeks & Duffield,* for appellant.

*Wilson & Shaw* and *W. F. Moore,* for appellee.

STEVENS, J.—On April 13, 1920, Charles E. Smith, a resident of Guthrie County, executed a note to appellant for $3,198.90, securing payment thereof by a chattel mortgage upon "ninety (90) head of yearling calves, located on Hodson pasture, three miles northwest of Menlo, Iowa, whether in excess of the above number or not, together with all increase and offspring of same." The mortgage was filed for record in the office of the county recorder of Guthrie County, and recorded on the following day. On or about November 1, 1920, the mortgagor shipped the cattle to South Omaha, Nebraska, consigned to Tagg Brothers & Moorhead, live-stock commission merchants, at that place. The cattle were received at the Union stockyards at South Omaha by the consignee, sold, and the proceeds, amount to $3,000.80, deposited in the Stockyards National Bank of Omaha, to the credit of the First National Bank of Omaha, for the use of the Peoples Savings Bank of Menlo, appellee herein. At the time of the shipment of the cattle to South Omaha, Smith was indebted to appellee on notes aggregating about $3,700. Appellee admitted in its answer that all of the proceeds of the sale of the cattle were received by it in the regular course of business, and applied, by direction of Smith, to the indebtedness due it; and that, the amount being insufficient to pay the

obligations of Smith to the bank in full, a new note for $700, the balance due, was executed by him to the bank.

The court, upon objection of counsel for appellee, excluded certain correspondence between the parties, but the letters are set out in full in the abstract. As error is urged in the ruling of the court excluding these letters, we shall, for the purpose of this decision, treat them as a part of the record. We gather from this correspondence that Smith, some time in March, 1920, executed to appellee a mortgage upon some cattle, to secure the payment of certain indebtedness; that no such cattle as were described in the mortgage were owned by Smith; and that the cashier of appellee, who alone transacted the business for the bank, learned of the fraudulent character of the mortgage for the first time after November 1st, and after the proceeds of the cattle had been applied to the payment of Smith's indebtedness to the bank.

Appellant does not claim that the lien of its mortgage followed the proceeds of the sale, but its contention is that the cashier of appellee bank aided, instigated, and abetted the shipment and sale of the cattle; that the bank received the proceeds thereof with full notice of appellant's mortgage; and that it is legally bound to account therefor to the mortgagee to the extent of its interest therein, upon the theory that one who joins in and knowingly assists in the conversion of chattels is liable therefor, even though he may have acted as the agent of another, and in good faith. As, in our opinion, under the facts of this case, the court, at the close of plaintiff's testimony, properly directed a verdict for appellee, we shall not enter upon an extended discussion of the law.

Conceding that, if the evidence in this case shows that the cashier of appellee bank instigated or aided and abetted Smith to sell the cattle in disregard of the rights of appellant, and to pay the proceeds of the sale to the bank, a recovery may be had upon the theory of appellant's petition, we shall briefly review and discuss the facts as they are presented to us by the record. The mortgagor was a customer and debtor of appellee's. Prior to the execution of appellant's mortgage, he fraudulently executed a mortgage upon cattle not in existence, to secure the indebtedness owed by him to appellee. The only direct connec-

tion of appellee's cashier with the sale and shipment of the cattle, so far as disclosed by the record, was that, some time shortly before November 1, 1920, he called Tagg Bros. & Moorhead over the telephone at South Omaha, and was answered by Herbert W. Johnson, cashier of that company. Johnson testified concerning the conversation that followed as follows:

"I received a call late one afternoon,—I think about a week prior to November 1st,—and the party said that he was Mr. Furber, cashier of the Peoples Savings Bank, Menlo, Iowa, and asked if we had a cattle market at South Omaha. I told him 'yes,' and I asked why he asked that question; and he said a customer of theirs, by the name of Smith, had some cattle in which he was interested, and had told him the reason he had not shipped was for the fact that he had communicated·with Tagg Bros. & Moorhead, and they had advised him that at that time there was no market for cattle at South Omaha. We have never had communication from C. E. Smith, and we have never done any business for him, except this one time. Mr. Furber stated that we would, no doubt, shortly receive a consignment of cattle from Mr. Smith. We received a consignment of cattle on November 1, 1920. These cattle were consigned from C. E. Smith to Tagg Bros. & Moorhead, Omaha. I saw Mr. Furber, November 1, 1920."

On November 1st, Furber, appellee's cashier, called at the office of the above commission firm, and informed Johnson that Tagg Bros. & Moorhead had a shipment from Smith, and that he desired them to be sure that the proceeds of the sale should go to appellee. Johnson testified further that he had a conversation with Smith about noon, as to the disposition he desired to be made of the proceeds of the sale of the cattle. This conversation, so far as material, was as follows:

"I think around noon Mr. Smith came in the office, and I asked him the usual question as to the disposition of the proceeds of the shipment, and he advised us to send them to the Peoples Savings Bank of Menlo, Iowa. Mr. Furber had stated that the proceeds should come to the Peoples Savings Bank, at Menlo, Iowa. Mr. Furber did not direct me as to the channel through which this money should be given to the Peoples Savings Bank. We handled this matter according to the instruc-

tions received from the correspondent of the Peoples Savings Bank of Menlo. I was to advise Mr. Furber at Wertheimer & Degen's office, if Mr. Smith did not authorize me to pay the proceeds of the cattle to the Peoples Savings Bank of Menlo. Mr. Furber stated that they were interested in the cattle.''

Another witness, Fred W. Lightfoot, testified to meeting Furber, and, concerning a conversation he had with him, testified as follows:

''Mr. Furber introduced himself with his card. He said he was interested in these cattle,—that he had a mortgage on these cattle,—and wanted to know if I had seen Mr. Smith; and I said, 'No, sir, I haven't seen Mr. Smith yet;' and he says, 'I don't want Mr. Smith to see me.' He says, 'I have a mortgage on these cattle,' he says,—mortgage covering, I think he stated, 45 head. * * * He says, 'I followed this shipment of cattle up here,' * * * and he says, 'My mortgage calls,'—I'm not positive about the number of head, but it runs in my head that he told me 45 head of white-faced yearlings; and he asked me what I thought the cattle would bring, and I told him, and he figured, and he says, 'Yes, I think they will pay out. Now,' he says, 'I don't want Mr. Smith to see me.' I met Mr. Furber twice after this,—once about 8 o'clock in the morning, and again about 10 or 10:30. He was around the stockyards, but did not show up at our pens any more.''

The record contains no other evidence tending to connect appellee in any way with the shipment or sale of the mortgaged cattle. Appellant does not claim that participation by Furber in the shipment and sale of the cattle is affirmatively proved, but counsel insist that, had the question been submitted to the jury, it might, by justifiable inferences from the evidence, have found as contended by them.

Conversion consists of any distinct act of dominion wrongfully exerted over chattel property in denial of the owner's right thereto, or inconsistent therewith. The mere receipt by appellee of the proceeds of the sale is not sufficient upon this point. *Casady & Co. v. German Sav. Bank,* 159 Iowa 149; *Commercial Sav. Bank v. Brooklyn L. & G. Co.,* 178 Iowa 1206; *First Nat. Bank v. Security Tr. & Sav. Bank,* 191 Iowa 842.

The cattle were in Smith's possession, and were shipped

and consigned to the commission firm at South Omaha in his own name. There is nothing in the record to show that the telephone conversation had by Furber with the commission firm in South Omaha was with the knowledge or for the benefit of the mortgagor. A proper inference therefrom is that he desired to assure himself whether there was, in fact, a cattle market at South Omaha. He claimed that Smith had told him that Tagg Bros. & Moorhead had advised him that at that time there was no cattle market in South Omaha. Furber turned up in Omaha on the day the cattle were received and sold, claiming an interest in them. We infer from the testimony that he believed that the bank had a mortgage upon some or all of the cattle. If he was in collusion with Smith, it is difficult to conceive what purpose he could have had in keeping out of his sight in South Omaha. The inference that Furber was watching Smith is far stronger than that he was in collusion with him. It would not have been proper for the court to have permitted the jury to speculate upon the possibility that Furber induced the shipment of the cattle, or that he was in collusion with Smith. The record does not justify it. Furber took no part in the sale of the cattle, and exercised no possible dominion over the property; and the only justifiable inference which the jury could reasonably have drawn from the evidence was that he was anxious that the proceeds of the sale be deposited in the bank at Menlo. The transaction was handled entirely by Smith, who gave all the necessary directions to the commission company for the transmission of the proceeds of the sale to appellee. Had the issues been submitted to the jury, and a verdict returned in favor of appellant, it must have been set aside.

Without extending the discussion, we need only say that a careful review of the record satisfies us that the judgment of the court below should be affirmed. It is so ordered.—*Affirmed.*

PRESTON, C. J., WEAVER and DE GRAFF, JJ., concur.