ROMAN, APPELLANT, v. ALBERT ET AL., RESPONDENTS.

(No. 6,232.)

(Submitted January 10, 1928. Decided January 30, 1928.)

[264 Pac. 115.]

*Fraudulent Conveyances—Husband and Wife—Lack of Con-
sideration—Failure of Delivery of Deed for Purpose of Pass-
ing Title—Badges of Fraud—Manner of Proving Fraud—
Gifts—Presumptions—Appeal.*

Appeal—Trial—Propriety of Court's Interrogating Witness not Review-
able in Absence of Objection, Exception or Specification of Error
in Brief.

1. In the absence of objection to interrogations by the trial judge
put to appellant while on the witness-stand relative to an
alleged fraudulent conveyance made to her by her husband, or
exception taken thereto, or specification of error based thereon in
the brief, the supreme court may not review the propriety of the
judge's conduct.

Fraud—May be Proved Circumstantially—Appeal—Finding of Presence
of Fraud—Supreme Court may Uphold in Face of Positive Testi-
mony of Defendant to the Contrary.

2. Because proof of fraud by direct evidence is difficult, it is
provable circumstantially and a wide latitude is allowed in assem-
bling trivial, remote and disconnected facts and circumstances
tending to show it, to be viewed as a whole and weighed against
the direct evidence of those charged with perpetrating it, swearing
to the bona fides of the transaction, and the supreme court in re-
viewing the testimony is not precluded from upholding a finding
of the trial court that fraud was present, merely because the
record contains positive and uncontradicted testimony to the con-
trary.

Evidence—Courts not Bound by Positive and Uncontradicted Testi-
mony if Unworthy of Belief.

3. Trial courts are not bound by the positive and uncontradicted
statements of witnesses but may consider their appearance and
demeanor upon the witness-stand, their manner of testifying and
their pecuniary interest in the proceeding, and disregard their testi-
mony if deemed unworthy of belief.

Fraud—Near Relationship not Badge of Fraud—Courts to Scrutinize
Closely Transaction Between Husband and Wife.

4. Though near relationship is not a badge of fraud and husband
may transfer his property to wife while he is solvent, where the
result of such a transaction is to foreclose a third person from
satisfying a just claim against the grantor, it must be subjected

___

2. Weight and sufficiency of circumstantial evidence of fraud, see
note in Ann. Cas. 1912A, 711. See, also, 12 R. C. L. 440. What is
sufficient proof of fraud, see note in 65 Am. Dec. 157.

3. See 10 Cal. Jur. 145, 10 R. C. L. 1006.

4. Transactions between husband and wife as fraudulent, see notes
in 19 Am. St. Rep. 657; 20 Am. St. Rep. 715; 90 Am. St. Rep. 497; 32
L. R. A. 67. See, also, 12 Cal. Jur. 972; 12 R. C. L. 513.

to the most searching examination, and where the circumstances cast suspicion upon the testimony concerning the transaction a court of equity may disregard it.

Fraudulent Conveyances—Husband and Wife—Transfer Without Consideration—Gifts—Presumptions.

5. *Held,* in an action to have a conveyance of real property from husband to wife declared fraudulent, that the finding of the trial court that the conveyance was made without consideration was supported by the evidence, under the rules that advancements made by the wife to the husband are presumed to have been gifts, and that where property is purchased with money of husband or wife and title placed in the name of the other, the presumption is that the conveyance was made as a gift.

Same—Deed from Husband to Wife—Failure of Delivery for Purpose of Passing Title—Who may Attack Transaction.

6. Where a deed from husband to wife was never delivered for the purpose of passing title and was only recorded for the purpose of defrauding the party who sought to have the conveyance set aside as fraudulent, the rule that only a creditor whose claim was in existence at the time of the conveyance may assert that the transfer was fraudulent does not apply.

Same—Delivery of Deed—Essentials.

7. In determining whether there was a delivery of a deed to the grantee, the intention of the parties at the time is the controlling factor; the grantor must unequivocally indicate it to be his intention that the instrument shall take effect as a conveyance in order to constitute a delivery; thus there may be a valid delivery without turning over the deed, or no delivery although the deed is handed to the grantee.

Same—Badges of Fraud—Case at Bar.

8. The following badges of fraud *held* to have been present in an action to set aside a conveyance of realty from husband and wife: Inadequacy of consideration, insolvency of the grantor, retention and possession of the property by the grantor, and assessment of the property, after conveyance, to the grantor and not to the grantee.

---

[1]   Appeal and Error, 4 C. J., sec. 2647, p. 726, n. 17; sec. 2869, p. 900, n. 96.
[2]   Appeal and Error, 4 C. J., sec. 2869, p. 899, n. 95. Fraudulent Conveyances, 27 C. J., sec. 771, p. 822, n. 57.
[3]   Evidence, 23 C. J., sec. 1791, p. 47, n. 35, p. 48, n. 38, 40, 41. Trial, 38 Cyc., p. 1945, n. 37.
[4]   Evidence, 23 C. J., sec. 1791, p. 48, n. 39. Fraudulent Conveyances, 27 C. J., sec. 775, p. 828, n. 9.
[5]   Fraudulent Conveyances, 27 C. J., sec. 777, p. 830, n. 17. Husband and Wife, 30 C. J., sec. 305, p. 708, n. 34. Trusts, 39 Cyc., p. 136, n. 22, p. 138, n. 30.
[6]   Fraudulent Conveyances, 27 C. J., sec. 198, p. 521, n. 7.
[7]   Deeds, 18 C. J., sec. 95, p. 197, n. 21, p. 198, n. 25; sec. 98, p. 202, n. 55; sec. 548, p. 441, n. 89.
[8]   Fraudulent Conveyances, 27 C. J., sec. 135, p. 484, n. 40; sec. 142, p. 491, n. 7; sec. 145, p. 492, n. 24; sec. 149, p. 494, n. 41; sec. 155, p. 496, n. 67; sec. 775, p. 828, n. 12.

6.   See 12 Cal. Jur. 978; 12 R. C. L. 493.
7.   What constitutes delivery of deed, see note in 53 Am. St. Rep. 537. See, also, 8 R. C. L. 978.

*Appeal from District Court, Carbon County, in the Thir-teenth Judicial District; George Bourquin, a Judge for the Second District, presiding.*

Action by Liberty Roman against John Albert and others, in which defendant Sadie Mae Puutio filed a cross-complaint. Judgment for defendant Puutio and plaintiff appeals. Affirmed.

*Messrs. Cannon & McKevitt,* of the Bar of Spokane, Washington, and *Messrs. Johnston, Coleman & Johnston,* for Appellant, submitted a brief; *Mr. E. J. Cannon* argued the cause orally.

Cases tending to support plaintiff's contention that the failure to record the deeds, under the facts appearing in this case, does not establish fraudulent intent on the part of the parties to the deed, are as follows: *Citizens' Trust Co. of Buffalo* v. *Eaves,* 5 Fed. (2d) 921; *Brown* v. *Easton,* 112 Fed. 592; *Crowley* v. *Brower,* 201 Iowa, 257, 207 N. W. 230; *Otis* v. *Sprague,* 118 Mich. 61, 76 N. W. 154; *Reed* v. *Brown,* 184 Mich. 515, 151 N. W. 592; *Litschgi* v. *Gottlieb,* 247 Mo. 53, 152 S. W. 310; *Phoenix Fire & Marine Ins. Co.* v. *Shoemaker,* 95 Tenn. 72, 31 S. W. 270; *Allen* v. *Overton et al.,* 208 Ala. 504, 94 South. 477; see, also, *Martin* v. *Flaharty,* 13 Mont. 96, 40 Am. St. Rep. 415, 19 L. R. A. 242, 32 Pac. 287; *Vaughn* v. *Schmalsle,* 10 Mont. 186, 10 L. R. A. 411, 25 Pac. 102.

Much appears to have been made in the lower court of the fact that the husband, in many particulars, after the execution of the deeds, acted, with their children, as his wife's agent in the management of her property. We find great encouragement upon that question in the following cases: *Aldridge* v. *Muirhead,* 101 U. S. 397, 25 L. Ed. 1013 [see, also, Rose's U. S. Notes]; *Wasam* v. *Raben,* 45 Ind. App. 221, 90 N. E. 636; *Geo. Adams & Burke Co.* v. *James Cook & Son* (Iowa), 15 N. W. 478; *Shircliffe* v. *Casebeer,* 122 Iowa, 618, 98 N. W. 486.

Upon the question of consideration for the giving of the deeds, and that a meritorious or equitable consideration, even

though inadequate, will justify reformation of a deed at the instance of the grantee, see the following cases: *Stover* v. *Hill*, 208 Ala. 575, 94 South. 827; *Robertson* v. *Melville*, 60 Cal. App. 354, 212 Pac. 723; *Smith* v. *Barksdale*, 110 Ga. 278, 34 S. E. 582; *Wilson* v. *Talley*, 144 Ind. 74, 42 N. E. 362, 1009; *Bronston* v. *Bronston Heirs*, 141 Ky. 639, 133 S. W. 584; *Bartlett* v. *White* (Mo.), 272 S. W. 944; *Partridge* v. *Partridge*, 220 Mo. 321, 132 Am. St. Rep. 584, 119 S. W. 415; 34 Cyc. 929; 23 R. C. L. 344, pars. 38–40.

The point that the right to reform will prevail over the rights of creditors of the husband, both general and judgment, is sustained by 23 R. C. L. 343, page 36, and the cases cited and also the following cases: *Beckius* v. *Hahn*, 114 Neb. 371, 44 A. L. R. 73, 207 N. W. 515; *Citizens' National Bank* v. *Judy*, 146 Ind. 322, 43 N. E. 259; *Comstock* v. *Coon*, 135 Ind. 640, 35 N. E. 909; *Milby* v. *Regan*, 16 Tex. Civ. App. 352, 41 S. W. 372; *Coates* v. *Smith*, 81 Or. 556, 160 Pac. 517; *Sicher* v. *Rambousek*, 193 Mo. 113, 91 S. W. 68.

Next will be considered those cases wherein the question of reformation of deeds arose with particular reference to the failure through mistake of the parties to include all of the property intended to be conveyed. We cite under this heading the following: *Perry* v. *Sadler*, 76 Ark. 43, 88 S. W. 832; *Butler* v. *Barnes*, 60 Conn. 170, 12 L. R. A. 273, 21 Atl. 419; *Critchfield* v. *Kline*, 39 Kan. 721, 18 Pac. 898; *Trunnell* v. *Tonole*, 104 Or. 628, 208 Pac. 583; *Laufer* v. *Moppins*, 44 Tex. Civ. App. 472, 99 S. W. 109; 34 Cyc. 936; 23 R. C. L. 335.

*Mr. John G. Skinner* and *Mr. George S. Smith*, for Respondents, submitted a brief; *Mr. Skinner* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

On July 31, 1926, the plaintiff, Liberty Roman, commenced action in the district court of Carbon county for the reforma-

tion of a certain deed and to quiet title to the real estate described in it and two other deeds; she named as defendants Steve Roman, her husband, John Albert, sheriff of the county, and Sadie Mae Puutio. Roman defaulted and thereafter appeared in the case only as a witness for the plaintiff.

Albert and Puutio joined issue as to the facts alleged in the complaint, and the latter filed a cross-complaint in which she attacked the deeds as fraudulent and set up a lien on the property described in the deeds by judgment against Steve Roman. Plaintiff, by reply, denied the allegations of the cross-complaint.

Being an equity case, the cause was tried to the court without a jury, and in due time the court made elaborate findings on all of the facts, and general findings to the effect that all of the allegations of the complaint were untrue and all of the allegations of the cross-complaint were true. On the findings the court entered appropriate conclusions of law and entered judgment dismissing the complaint and awarding Puutio the relief for which she prayed in her cross-complaint.

Plaintiff has appealed from the judgment and has assigned error on each of the findings made and on the action of the court in refusing to adopt the proposed findings tendered by her, which assignments, however, taken as a whole, raise but the question of the sufficiency of the evidence to support the findings and judgment of the court.

The facts, as disclosed by the record, are substantially as follows: Steve and Liberty Roman were married in New York in 1895 immediately after their joint arrival from the Swiss Tyrol. For two years Steve worked in a brewery; the couple then, with their first child, Veronica, moved to Utah, where Steve worked in a coal mine for one year, and they then came to Red Lodge, where they have since resided; here Steve worked in the coal mines for a number of years and then ran a saloon for some time and then changed to the wholesale liquor business. On the outlawry of his business, the saloon building was converted into a moving picture theater and con-

siderable money was expended in improvements in 1917. Up
to 1923 Liberty Roman conducted a rooming and boarding
house over the theater. During these latter years the family
consisted of the parents, two sons and three or more daughters.
The family was thrifty and the children all received a fair
education; the older son was graduated as a lawyer and went
to a sister state. Steve Roman, the second son, John, and the
girls ran the picture show, known as the ''Roman Theater'';
none of the family received a wage for services, but their
receipts from all sources were deposited in bank in the name
of Steve Roman; as aptly put by Veronica, there was but ''one
pocket in the whole family.'' Property was accumulated, and,
up to April 5, 1926, there stood of record in Carbon county,
in the name of Steve Roman, a lot on which stood the family
residence, a lot on which stood a restaurant building, and two
and a fraction lots on which stood the Roman Theater.

In 1925 the family bitterly resented an intimacy which had
grown up between the son, John, then twenty years old, and
the defendant Sadie Mae Puutio, which culminated in the
arrest of Miss Puutio at the instance of Steve Roman upon
highly libelous charges. On dismissal of the complaint against
her, Miss Puutio instituted an action against Steve Roman for
malicious prosecution. A trial was had, resulting in an in-
structed verdict and judgment in favor of the defendant, but
on appeal this judgment was reversed and the cause remanded
for a new trial. (*Puutio* v. *Roman,* 76 Mont. 105, 245 Pac.
523.)

Knowledge of the reversal came to the Roman family on
April 3, 1926, and, two days later, they placed of record three
deeds, dated April 26, 1920, two of which bore the acknowl-
edgment of Steve Roman as of that date and the third as of
April 29, 1926. The first and second conveyed to Liberty
Roman the residence property and the restaurant property,
while the third described but one lot of the two and a fraction
on which stood the theater building. On April 5, 1926, Steve
Roman gave Veronica a bill of sale to his automobile and had

the bank account transferred from his name to that of the "Roman Theater."

The remittitur from this court was received on April 16, and thereupon judgment was entered in favor of Sadie Mae Puutio and against Steve Roman for costs amounting to $495.50 and execution issued thereon and was levied upon that portion of the theater property not described in the deeds mentioned above. On May 3 Steve Roman executed a correction deed conveying all of the theater property to his wife, which deed was placed of record, and thus Steve Roman was divested of the last vestige of property and rendered insolvent.

A second trial of the malicious prosecution case was had on June 3, 1926, and this trial resulted in a final judgment in favor of Miss Puutio in the sum of $6,000 and costs. An appeal was taken, but no stay was effected, and execution was thereupon issued and levied upon all of the property described in the several deeds from Steve Roman to plaintiff. Thereupon plaintiff commenced this action.

The testimony by which plaintiff sought to establish the allegations of her complaint and to defeat the claim of defendant Puutio is substantially as follows: The plaintiff testified that she came to this country and was married at the age of eighteen years, and that, for eight years prior thereto, she had peddled clothing, glassware and telescopes in Basel, Switzerland, living away from home and paying her own expenses; that she made approximately $8,000, part of which she sent home and part of which she kept, so that, on embarking for New York, she had the equivalent of $3,400, of which she had $3,000 left on arriving in New York. This $3,000 she kept until the family went to Utah, spending about $500 on the trip and thereafter purchasing a house in Utah. What the house cost or what was done with it we are not informed. She then testified that she had over $3,000 left when the family came to Red Lodge, stating: "I kept boarders and the man worked in the mine." This money, she says, she gave

to Steve to invest, and counsel contend that this was the nucleus from which Steve built up his holdings valued at more than $40,000, although the property was not acquired until long after the family came to Red Lodge, nor until after Steve had worked steadily for years.

Plaintiff further testified that in 1907 she received $4,000 from the estate of her father in payment for what she had given the family while peddling, and this, she asserts, was used in remodeling the theater in 1917. The dwelling-house was remodeled in 1923, and again she says that the money employed was hers, and again speaks of the money earned by peddling.

In 1920 the family were not in full accord, and Steve went to Utah, where he remained for more than a month. In his absence plaintiff sold a house and sent the deed to him for execution. She claims that she did not know that the property was in his name until, while he was absent, she discovered that he had given two notes to the bank and spent the money for liquor and had given checks to saloons or bootleggers, and that, on his return and for the purpose of preventing further waste of funds for liquor, she compelled Steve to deed the property to her. How the making of secret deeds could accomplish this purpose while the bank account remained in Steve's name does not appear.

The attorney who drew the deeds testified by deposition. His testimony is to the effect that the deeds were executed before Steve went to Utah and that Steve told him he wanted to deed the property to his wife because so much of her money had gone into it and he was going away; he further testified that, on complaint of members of the family that Steve was drinking and gambling, he had gotten Steve up to his office and talked with him just before making the deeds and that thereafter Steve left home and was gone for several months. He disclosed that he had received telegrams and letters from the Roman family before making his deposition, but refused to produce them and make them part of the deposition.

As to delivery, plaintiff testified that Steve came home from the law office on April 26, 1920, and handed her the three deeds, saying, "Here is the deed, put it away." In this Steve and three of the daughters corroborate her, while three neighbors testified that in 1920 plaintiff showed them certain papers and told them that Steve had turned all of the property over to her. Two of these witnesses testified that they merely saw papers in her hand, while the third. stated that he read the deeds, but, on being asked, through an interpreter, to read them in court, stated that he could not read English. Plaintiff testified that she never read the deeds and did not know that a part of the property had been omitted until the sheriff served the writ of execution upon her in April, 1926.

On cross-examination the plaintiff was evasive and reluctant to answer questions, and the court repeatedly intervened by propounding questions to her and admonishing her to answer the questions put to her; she demanded that an interpreter be sworn, but this demand was not made by her attorneys, and the court disregarded it, and the record discloses that she could answer such questions as she cared to very well without an interpreter. When crowded for an answer she fell back upon the time-honored reply, "I do not remember."

So much for the pertinent testimony for plaintiff. On the other hand, the record shows that, in addition to the doubt cast upon the showing of delivery of the deeds in 1920 by the fact that the deeds were not recorded until this court had reversed the first judgment in *Puutio v. Roman,* and the conflicts and inconsistencies found in the plaintiff's testimony, no change was made in the management of the property in 1920, and thereafter, as before, Steve Roman exercised absolute control over the property, managed the theater, and took out all licenses in his name. He applied for and received all insurance policies written in his name and running to him as owner, including those written by the attorney who drew the deeds and who knew that Steve was not the owner and had no insurable interest in the property, if in fact he had deeded it

to his wife and delivered the deeds with the intention of passing immediate title. All of the property was assessed to Steve. Roman, and the tax receipts and notices were made in his name, and, on several occasions, he made complaint of excessive valuation without claiming that he acted for anyone other than himself. Each year Steve Roman made his federal income tax return based upon the income from the theater as his property, and therein claimed exemptions as the head of the family and supporter of the children and made deductions for the depreciation in his property, while plaintiff never made such a return. All of these acts of dominion were known to and acquiesced in by the plaintiff.

In 1922 a pipe organ was installed in the theater at a cost of $9,750, and, contrary to the statement made by Veronica that she signed the contract, it was signed by Steve Roman in his own handwriting, and the payments were made from his bank account. Veronica further testified that checks on the bank account were signed by herself and other members of the family, but all checks produced in court were signed by Steve Roman. All leases on the restaurant property were made by Steve Roman as owner of that property.

Steve Roman signed bail bonds and made affidavit thereto that he was a freeholder; he made a like affidavit for the purpose of securing the admittance of a relative to the country. He registered for a special election of freeholders and thereafter voted at such election, while plaintiff neither registered for nor voted at that election.

In support of her assertion of ownership of the theater building, plaintiff testified that in 1920 there was a mortgage for $18,000 upon it which she paid off, first saying that it took her four years, and then two years; but the county records show that the mortgage was satisfied of record on May 3, 1920, or a week after the deeds are dated. While plaintiff and the members of the family testified that she was in control and that Steve acted only under her direction and supervision, the record discloses that she knew little of the business or business

[81 Mont. 393.]

affairs and that Steve transacted the affairs of the family and managed the business of the theater as his own.

The defendant Puutio did not, and, in the very nature of things, could not, produce any evidence negativing the testimony to the effect that plaintiff furnished the funds with which the property was purchased or that the deeds were delivered in 1920.

1. Counsel for plaintiff criticise the trial court for in-
[1] terrogating plaintiff, and suggest that the judge thereby became a partisan and his findings and judgment were foreshadowed by the unconscious bias acquired by his partisanship. In the first place, no objection was interposed and no exception taken to the action of the court and no specification of error is based thereon; therefore the rather lengthy statement of counsel raises no question for determination. However, a careful reading of the record shows that the judge was actuated only by the laudable purpose of bringing out the facts, if possible, whether those facts were favorable to the plaintiff or the defendants, and contains no suggestion of partisanship.

2. Counsel's argument in plaintiff's brief seems to be based upon the theory that this court should take the record and from it determine the facts without regard to the findings of the trial court. They say the testimony on the part of plaintiff proves conclusively the bona fides of the deeds and their delivery and must be so accepted, and that to overcome this evidence "one must assert and prove that each of these witnesses, including an attorney of standing at the bar of this state, wilfully and deliberately committed perjury."

So far as the attorney is concerned, he may be eliminated, as he testified only as to the execution of the deeds and knew nothing of the consideration or delivery, while the judgment is based upon the findings that "there was no consideration for, or delivery of" the deeds in question, "and no intention to make delivery thereof, and that they were placed of record during the pendency of the malicious prosecution case for the purpose of hindering, delaying, defeating and defrauding de-

fendant Sadie Mae Puutio of the amount owing to said defendant from the said Steve Roman, and that the plaintiff participated in such fraudulent purpose and intent.''

As to our jurisdiction here, the rule that this court cannot [2] try equity cases *de novo* but may only review the record for the purpose of determining where lies the preponderance of the evidence and will only reverse a judgment when the evidence strongly preponderates against the findings of the court, and then will not disturb the findings when the evidence furnishes reasonable ground for different conclusions, has been too often and too recently declared to require citation of authorities.

3. If, under the above rule, we must say that a fact is proven by the undisputed statement found in the record, we must hold that the evidence strongly preponderates against the findings of the trial court, for the only witnesses testifying directly as to the matter certainly testified that there was consideration for, and delivery of, the deeds at the time of their execution in 1920.

However, in reviewing the evidence in such a case as this, we are controlled by the following well-settled principles of law and equity heretofore declared by this court:

4. As in the case of *Merchants' National Bank* v. *Greenhood*, [3] 16 Mont. 395, 41 Pac. 250, 851, the great issue in this case was fraud. In the poetical words of Mr. Justice De Witt, in the opinion in that case: ''Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in straight lines. It goes in devious ways. We may with difficulty know 'whence it cometh and whither it goeth.' It 'loveth darkness rather than light, because its deeds are evil.' It is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon its sinuous course. When we so discover it, the searchlight of a judicial investigation goes back over its trail and lightens it from beginning to end. As the woodsman follows his game by slight indications, as a broken twig or a displaced pebble, so fraud may become

apparent by innumerable circumstances, individually trivial, * * * but in their mass 'confirmation strong as proofs of holy writ.' "

5. Owing to its nature, fraud is provable by circumstantial evidence, and a wide latitude is allowed in assembling trivial, remote and disconnected facts and circumstances which are interpreted by bringing them all together and contemplating them "all in one view" (Bump on Fraudulent Conveyances, 759), and this accumulation is weighed against the direct evidence of those charged with perpetrating the fraud who would naturally swear to the bona fides of the transaction under investigation. We are not, therefore, in reviewing the testimony contained in the record, precluded from sustaining the findings of the trial court by reason of the fact that the record contains positive and uncontradicted statements contrary to those findings.

6. Nor is the trial court bound by such testimony; it is not bound to believe all that it hears: "The appearance and demeanor of the witnesses, their manner of testifying, and the probability or improbability of the truth of their statements are all to be considered in connection with the other facts and circumstances in the case. When the statements of witnesses, although positive, and not directly contradicted by other witnesses, are improbable, contradictory, and inconsistent in themselves, when they relate to alleged transactions with persons who by death or absence are unable to dispute them, when the witnesses are directly and pecuniarily interested in the result of the controversy, * * * and the attendant circumstances are such as to cast suspicion upon the entire transaction as narrated by them, the court may disbelieve such witnesses and disregard their testimony." (*Reid* v. *Hennessy Merc. Co.*, 45 Mont. 383, 123 Pac. 397; see, also, *Daniels* v. *Bi-Metallic Co.*, 56 Mont. 284, 184 Pac. 836; *Casey* v. *Northern Pac. Ry. Co.*, 60 Mont. 56, 198 Pac. 141; *Warren* v. *Senecal*, 71 Mont. 210, 228 Pac. 71; *State ex rel. Hansen* v. *District Court*, 72 Mont. 245, 233 Pac. 126.)

7. While near relationship is not a "badge of fraud" and [4] there is nothing in the law to prevent a man from transferring his property to his wife while he is solvent (*Dick* v. *King,* 80 Mont. 40, 257 Pac. 1022), the marital relation lends itself readily to the perpetration of fraud, and where the result of a transaction between husband and wife is the foreclosure of third persons from satisfying just claims, the transaction "must be subjected to the most searching examination, if not, indeed, suspicion" (*Lambrecht* v. *Patten,* 15 Mont. 260, 266, 38 Pac. 1063; *State ex rel. Robison* v. *District Court,* 56 Mont. 592, 186 Pac. 335; *Harrison* v. *Riddell,* 64 Mont. 466, 210 Pac. 460); and where the surrounding circumstances cast suspicion upon the testimony concerning such a transaction, a court of equity may disregard the testimony. (*Security State Bank* v. *McIntyre,* 71 Mont. 186, 228 Pac. 618.)

8. As to the consideration for the property being paid by [5] the wife, the testimony is vague and unsatisfactory at best. Plaintiff said that something like twenty years prior to the date of the deeds in question she had $3,000 which she "gave to the man to invest." Now, the presumption is that any advancement by a wife to her husband is a gift (*Bast* v. *Bast,* 68 Mont. 69, 217 Pac. 345), and the rule as to resulting trusts, declared by section 6785, Revised Codes of 1921, is subject to the exception that where the property is purchased with money of a husband or wife and the title placed in the name of the other, the presumption, rebuttable in character, is that the conveyance is made as a gift (*Clary* v. *Fleming,* 60 Mont. 246, 198 Pac. 546).

Plaintiff's statement, quoted above, is at least as consistent with a gift to be used or invested for himself as he saw fit as it is with the theory that she delivered the money to him to invest for her, while Steve Roman's testimony is almost conclusive that no trust arose. He corroborated her statement that she had the $3,000, but when asked what she did with it he replied, "Well, she just handed it to me as it was necessary." He said he bought property with the money, but when

asked why he took title in his own name, he replied, "Well, because she didn't told me anything. * * *"

On this evidence the court was justified in finding that the conveyance made was without consideration, merely voluntary. (*Security State Bank* v. *McIntyre,* above.)

9. As the court found that the deeds were never delivered [6] for the purpose of passing title and were only recorded for the purpose of defrauding the defendant Puutio, the rule that only a creditor whose claim was in existence at the time of the conveyance may assert that the transfer was fraudulent does not apply.

10. The evidence as to delivery of the deeds in 1920 for [7] the purpose of passing title is also vague, and the manner in which the property was thereafter handled casts doubt upon the probability of such a delivery. Gathering together the "twigs" and "displaced pebbles" marking the trail of fraud found by the trial court, the composite picture is rather of a conveyance made at the insistence of the plaintiff, to take effect in the event the husband did not remain at home, eschew his bad habits and properly conduct his business; and, with this club hanging over his head, Steve mended his ways. However that may be, even if the deeds were turned over to Liberty Roman in 1920, her possession does not necessarily show a delivery passing title. The intention of the parties at the time is the controlling factor, and there may be a valid delivery without turning over the deed, or no delivery although the deed is handed to the grantee. (*Martin* v. *Flaharty,* 13 Mont. 96, 40 Am. St. Rep. 415, 19 L. R. A. 242, 32 Pac. 287.)

To constitute delivery, "it is required that the grantor shall unequivocally indicate it to be his intention that the instrument shall take effect as a conveyance of property in order to have it produce that result." (*Springhorn* v. *Springer,* 75 Mont. 294, 243 Pac. 803.)

11. In determining that fraud vitiated the transaction as a [8] conveyance of property to take effect as of the date of recording the instruments, the court was aided by the inference of fraud which it was permitted to draw from the fol-

lowing "badges of fraud" shown by the testimony: Inadequacy of consideration (*Security State Bank* v. *McIntyre,* above); insolvency of the grantor (*Hart-Parr Co.* v. *Schafer,* 73 Mont. 429, 236 Pac. 675); retention and possession of the property by the grantor (*Hart-Parr Co.* v. *Schafer,* above); unusual delay in recording the deeds (27 C. J. 490); the assessment of the property to grantor and not to grantee (27 C. J. 496).

Under the law, as declared above, we cannot say that the evidence clearly preponderates against the findings of the trial court, and must therefore hold that the judgment is supported by the evidence.

For the reasons stated, the judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES STARK and GALEN concur.

MR. JUSTICE MYERS: I concur in the result, but not in all that is said in the opinion. There are some statements in the opinion to which I do not subscribe.