TALMAGE–SAYER CO., Respondent, *v.* SMITH et al., Appellants.

(No. 6,864.)

(Submitted December 5, 1931. Decided January 19, 1932.)

[7 Pac. (2d) 536.]

*Mr. Guy C. Derry* and *Mr. Paul B. Bowen,* for Appellants, submitted a brief; *Mr. Derry* argued the cause orally.

*Mr. C. C. Rowan,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendants Fred Dugan and the Billings Credit Adjustment Bureau have appealed from a judgment in favor of the plaintiff, Talmage-Sayer Company, a corporation, entered in an action for conversion instituted by the plaintiff against William H. and Elizabeth Smith, man and wife, and these appealing defendants.

The controversy out of which the action arose is as to whether certain cattle sold by the defendants Smith and others, seized and sold under foreclosure of a mortgage held by the plaintiff, were covered by mortgage to the plaintiff, or by mortgages held by these appealing defendants.

Prior to 1924, the defendants Smith were crop leasers on a ranch in Carbon county, owned by one Leroy Sturlin, of whom they had purchased certain cattle, in payment for which they had given him their note, secured by a mortgage on the purchased cattle and their increase, prospective crops, and other personal property.

Sturlin was indebted to the plaintiff, and, in satisfaction thereof, assigned the Smith note and mortgage to it. The Smiths were also indebted to plaintiff, and, in November, 1925, executed to plaintiff, as security for the combined debt, a mortgage on the property described in the Sturlin mortgage. It was not intended by the parties that any cattle owned by the Smiths, except those purchased from Sturlin, should be included in this mortgage. The mortgage describes three red cows branded $\overline{V9}$, one Holstein, one White Face, two red and one roan, branded with a U over an S, thus particularly describing nine cows, and adds "5 Yearlings branded [reverse

LS quarter circle] and nine calves, being the increase from the above cattle.''

In March, 1927, Smith and wife mortgaged to a Columbus bank fourteen head of ''mixed colored cows,'' eight heifers, one and two years old, and four calves, all branded with the LS brand, and in June of that year they mortgaged to a Billings bank fourteen cows, four heifers, and five calves, all likewise branded, with the exception of two cows branded with a box X. This last mortgage describes one cow as a three year old and the others as seven and eight years old. The LS brand was acquired by Mrs. Smith in 1924.

In 1927 the defendant Dugan, the Credit Bureau being but his *alter ego,* secured an abstract of the chattel mortgages covering the property of the defendants Smith from the clerk of Carbon county. This abstract disclosed eleven of such mortgages, including the two to the Columbus and Billings banks, but did not include the mortgage to plaintiff, although it was duly filed in that county and kept in good standing by the filing of the required affidavits. Determining that all of the mortgages, except the two to the banks, were outlawed, Dugan purchased those two, and thus secured what he considered either first, or first and second liens, against the Smith cattle.

In the fall of 1928 Mrs. Smith sold sixteen head of cows and young stock, all branded with the LS brand, to one William Birkland, a neighbor, and received therefor two checks totaling $545. The day after the sale, Dugan proceeded to the Smith place with the sheriff for the purpose of seizing the cattle and selling them on foreclosure of his mortgages. The sheriff asked Mrs. Smith ''where their stock was,'' and she replied that ''she had sold them to Mr. Birkland.'' Asked concerning the proceeds, Smith admitted that they had the checks in the house, and, on demand, they indorsed and delivered the checks to Dugan, who thereupon ''called off'' the foreclosure.

Some months later the plaintiff placed its mortgage in the hands of the sheriff for foreclosure. The sheriff seized and

sold all property that he could find answering the description in the mortgage, including five cows branded with the LS brand; crediting the proceeds left a balance of over $800 due on the mortgage.

The sheriff testified that he asked Birkland about the cattle purchased from Mrs. Smith, but that he was not able to find them; however, Birkland paid to plaintiff the sum of $545, the value of the cattle, with the understanding that it would be returned to him if plaintiff recovered the purchase money from Dugan. Dugan refused payment, and this action was instituted.

The complaint alleges that Smith and wife, Dugan, and the Credit Bureau conspired together to defraud plaintiff of its mortgage security, and that plaintiff expended the sum of $150 in pursuit of its property, and $150 in attorneys' fees. Dugan and the Credit Bureau, by answer, denied the allegations of the complaint, and, by cross-complaint, alleged that the cows sold on plaintiff's foreclosure were not included in its mortgage, but were covered by the Dugan mortgages. They prayed that plaintiff take nothing by its action, and that they be awarded judgment against plaintiff for the value of the cows alleged to have been wrongfully seized.

Issue was joined by reply, and the cause tried to the court without a jury. Each side tendered proposed findings of fact and conclusions of law; those tendered by the plaintiff were adopted by the court, and thereon judgment was entered in accordance with the prayer of the complaint, except as to the claim for $150 expenses, on which there was no substantial evidence adduced.

The appealing defendants predicate error upon each of the adverse findings and the conclusions drawn therefrom, and upon the refusal to make numerous findings tendered by the defendants, but the specifications collectively raise only questions as to the sufficiency of the evidence to support the findings and judgment and the power of the court to award attorneys' fees in such an action.

The testimony of the defendants Smith is to the effect that they had a number of cattle at the time they purchased the Sturlin herd; the former were included in the mortgages acquired by Dugan, the latter in plaintiff's mortgage; these cattle ran together and were given the same care. Of the Sturlin cattle, two cows were sold with the consent of the mortgagee; one was butchered; the others, with the exception of one of the yearlings, died of blackleg, alfalfa bloat, and other ailments. The original stock, however, with a few exceptions, survived the misfortunes which overtook the Sturlin cattle.

Contrary to the patent facts, Mrs. Smith first denied that she signed plaintiff's mortgage or knew of her husband doing so; she declared that the nine calves described therein were not offspring of Sturlin cattle. Thereafter she asserted that plaintiff's mortgage note had been fully satisfied years before the trial by delivery of grain, and that Mr. Talmage had agreed to send her the canceled note and mortgage. She testified that all of the cattle sold to Birkland, with the exception of the one survivor of the Sturlin herd, were acquired elsewhere than from Sturlin prior to the purchase of the Sturlin cattle, or were the offspring of such cattle. However, it is clear that the "nine calves" included in plaintiff's mortgage were among the cattle sold to Birkland. Mrs. Smith described each of the five cows sold under plaintiff's foreclosure, and explained the origin thereof in such manner as to exclude those cows from plaintiff's mortgage.

Under the showing thus made by the defendants, if the testimony of the defendants Smith is taken at its face value, the Dugan mortgages covered six head of cattle sold to Birkland and the five head sold on plaintiff's foreclosure. However, even standing alone, crediting the testimony of Smith and wife would constitute a severe strain on the credulity of any trier of facts. There is evidence in the record which would warrant the conclusion that all cattle owned by the Smiths, at the time they purchased the Sturlin cattle, were mortgaged to the Rock Creek State Bank, and that a foreclosure of that mortgage deprived them of all of those cattle, with the excep-

tion of two cows. If the court so believed, it would then be called upon to believe that those two cows increased to a herd of twenty-one, while the Sturlin cattle, in the same field, decreased to one.

The fact that a number of the cattle described in Dugan's second mortgage were seven and eight years old would negative such an assumption, but might indicate that the Smiths did own other cattle than those purchased from Sturlin and their increase. However, as Mrs. Smith did not acquire the LS brand until 1924, and all of the cows last described were so branded, with the exception of the two box X cows, it is clear that those LS cows bore other brands as well.

From the similarity in number, age, kind, and description of the cattle included in the three mortgages under consideration, the inference is warranted that, with the possible exception of the two box X cows, there was but one herd of cattle, all covered by each of the mortgages, and that the aged cattle bearing the LS brand also bore the brands described in the plaintiff's mortgage. It is significant that the Smiths, in attempting to convince the court that all of the cattle involved in this suit were other than Sturlin cattle, did not say that they did not bear the brands on the Sturlin cattle, or state what brands they bore other than the LS brand. The two box X cows may have been the two cows left to the Smiths by the Rock Creek State Bank, but they were not included in either the cattle sold to Birkland or the five cows sold on plaintiff's foreclosure; their fate is undisclosed.

Birkland testified that, at the time he purchased the cattle he inquired of Mrs. Smith as to her right to sell them, and her reply was that they were mortgaged to "Talmage," but that she was "honest enough to see that he was paid." Mrs. Smith denied this statement, but the court was at liberty to believe Birkland and to disbelieve Mrs. Smith. Birkland further assumed to say that, from his knowledge of the Smith cattle, on an examination of the plaintiff's mortgage, the cattle sold to him were covered by plaintiff's mortgage. It would seem that his statement was based principally upon the

LS brand and would apply equally to the cattle described in the Dugan mortgages; consequently it has little evidentiary value. However, on the whole record, there is sufficient evidence to support the court's finding that the cattle sold to Birkland were covered by plaintiff's mortgage, and this finding will not be disturbed.

The court made no direct finding with respect to defendants' cross-complaint, but it found that the allegations of the complaint are true, which finding would negative a finding that any property not covered by plaintiff's mortgage was seized and sold under its foreclosure proceeding, and the conclusion of law and judgment awarding plaintiff the full amount claimed as against the cross-complaint is a denial of the right to recover on the cross-complaint.

The evidence above is sufficient to warrant the necessarily implied finding in support of the judgment that the five cows described in the cross-complaint were included in plaintiff's mortgage, and, consequently, the further implied finding that plaintiff did not convert to its use cattle to which Dugan was entitled in satisfaction of his mortgage. (See *Quinlan* v. *Calvert*, 31 Mont. 115, 77 Pac. 428.)

The mere fact, however, that the cattle sold to Birkland were covered by plaintiff's mortgage does not alone entitle plaintiff to the judgment against Dugan for the amount of the proceeds of the sale. The unauthorized sale of mortgaged property to a party having knowledge of the mortgage does not operate to discharge the mortgage lien; the purchaser merely acquires any equity in the property over and above the amount due on the mortgage debt. (*Puckett* v. *Hopkins*, 63 Mont. 137, 206 Pac. 422.) Here, of course, there was no "equity" in the property, as the amount due on the mortgage note was far in excess of the full purchase price. After such a sale, the mortgagee may follow and take possession of the property under the mortgage (*Hathaway* v. *Brayman*, 42 N. Y. 322, 1 Am. Rep. 524); he may proceed to foreclose the mortgage against the property in the hands of the purchaser (*Bank* v. *Gibson*, 109 Cal. 197, 41 Pac. 1008), ratify the sale,

and sue the mortgagor for the proceeds (*Burke* v. *First Nat. Bank,* 61 Neb. 20, 87 Am. St. Rep. 447, 84 N. W. 408), or he may sue the mortgagor and purchaser jointly as for conversion (*Lefkovitz* v. *Lester,* 11 Ala. App. 504, 66 South. 894). In case of an action in conversion, the plaintiff would be entitled to damages to the extent of the amount he expended in following the property. It may be that, were the circumstances such that the mortgagee could not follow the cattle, it would have a remedy in equity (*Waters* v. *Cass County Bank,* 65 Iowa, 234, 21 N. W. 582), but such is not the case presented.

While the sheriff testified that he "could not find" the cattle sold to Birkland, the record discloses that they were on Birkland's ranch when the sheriff visited it, and the only reason they were not "found" or seized was that Birkland gave plaintiff a check for their full value in lieu of the cattle, with the understanding that the amount would be repaid him if the plaintiff was successful in recovering the purchase money from Dugan.

As the unauthorized sale of mortgaged property does not affect the lien of the mortgage, there is, of course, no transfer of the lien to the proceeds of such sale, and no additional lien attaches to the proceeds. (*Riddle* v. *Etling,* 84 Cal. App. 460, 258 Pac. 162; *Simon Casady & Co.* v. *German Sav. Bank,* 159 Iowa, 149, 140 N. W. 401.)

The judgment can only be sustained if the record contains substantial evidence tending to prove the necessary allegations of the complaint to the effect that the sale was collusive, or that the defendants conspired to defraud the plaintiff of its security, or that Dugan received the checks with knowledge that they constituted the proceeds from an unauthorized sale; the mere receipt of the proceeds of such a sale, by a third party, is not "conversion." (*Iowa Credits Co.* v. *People's Sav. Bank,* 196 Iowa, 967, 192 N. W. 139.)

While we recognize the fact that fraud cuts down everything, and that, from its very nature, it "conceals itself" and must be deduced from circumstances which may be "individually trivial," and when it is discovered at its

destination the judicial investigation must go back over its trail to discover whence it came (*Merchants' Nat. Bank* v. *Greenhood*, 16 Mont. 395, 41 Pac. 250; *Roman* v. *Albert*, 81 Mont. 393, 264 Pac. 115), we find in the record no "sinuous trail" leading from the door of Dugan's Credit Adjustment Bureau to the Smith and Birkland ranches.

It is manifest that Dugan had no preknowledge of the sale of the cattle, and only learned that it had been made when he appeared at the Smith place with the sheriff, seeking to seize the cattle described in his mortgage and have them sold in satisfaction of his mortgage debt. There is not an iota of testimony to warrant the finding that the allegation of the complaint to the effect that Dugan conspired with the Smiths to defraud this plaintiff by selling the cattle described in its mortgage, or that the proceeds of the sale were turned over to Dugan in furtherance of such a conspiracy.

As to Dugan's knowledge on the subject, in spite of the fact that he was lulled into a position of fancied security by the defective abstract furnished him by the county clerk, he had, perhaps, constructive notice of the plaintiff's mortgage by reason of the fact that it was filed as required by law, but such knowledge was not enough to fix liability upon him in this action; in order to do so, the plaintiff was required further to show that he had knowledge of the origin of the fund paid to him as a creditor. (*Security State Bank* v. *First Nat. Bank of Ismay*, 78 Mont. 389, 254 Pac. 417.)

Knowledge of the existence of a chattel mortgage is sufficient to put a person intending to deal with the mortgagor on inquiry (Jones on Chattel Mortgages, 5th ed., sec. 54), but the mortgage, to be effectual as against third persons, must point to the subject matter of it so that such third person by its aid, together with the aid of such inquiries as the instrument itself suggests, may identify the property covered (Id., sec. 55).

Had there been but one mortgage on the Smith cattle, from the information that the checks in question were the

proceeds from the sale of such cattle, Dugan might be said to have had knowledge of the source of the fund paid him. Here, however, there was a succession of mortgages on the Smith cattle, and it would appear that the mortgagors had acted with the intent to conceal rather than disclose that the three mortgages in suit covered the same cattle. Had Dugan secured a copy of plaintiff's mortgage and compared it with those assigned to him and secured a description of the cattle sold to Birkland, he would have discovered that all of the cattle mortgaged to him, with the exception of the two cows, and all of the cattle sold to Birkland, were branded with the LS brand, while only five of the twenty-three head mortgaged to plaintiff were so branded. Inquiry of the plaintiff would have disclosed the fact that it held a mortgage only on cattle purchased by the Smiths from Sturlin and their increase, and inquiry of the Smiths would have elicited the statement that none of the cattle sold to Birkland were either Sturlin cattle or the increase from them, unless Mrs. Smith admitted, as she did finally on the stand, that one of the yearlings described in the plaintiff's mortgage was sold to Birkland, and it is exceedingly doubtful that she would have made that statement at the time she turned the checks over to Dugan. The only actual knowledge that Dugan had was that the checks were the proceeds from the sale of the Smith's cattle, and that he held two mortgages on such cattle, which he believed, and had reason to believe, constituted the only liens on their cattle.

There is, therefore, no evidence warranting the finding that Dugan wrongfully converted the proceeds of the sale; he but accepted, in partial payment of a past-due indebtedness, that which he believed to be the proceeds from the wrongful sale of a part of his security for that indebtedness under a mortgage which he was even then seeking to foreclose; he is, at least, in no worse position than if he had been paid a sum of money as to the source of which he had no knowledge or information.

In view of the foregoing, the remaining questions presented need not be discussed.

The judgment is reversed and the cause remanded to the district court of Carbon county, with direction to enter judgment in favor of the appealing defendants on plaintiff's alleged cause of action.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.

Rehearing denied February 5, 1932.