## Dunbar, et al. v. Meadows, et al.

(Decided June 8, 1915.)

## Appeal from Russell Circuit Court.

1. Deeds—Action to Cancel—Estoppel.—In an action by the widow to cancel a deed made by the decedent just prior to his marriage with her, where the evidence was conflicting as to whether she knew of the deed before her marriage, this court will not say that the lower court erred in holding that she knew of the deed and was, therefore, estopped to complain that it was made in fraud of her marital rights.

2. Deeds—Delivery—Intention of Parties.—The question of delivery of a deed is generally one of intention of the parties, and there must be some act or declaration from which an intention to deliver may be inferred, and they must be of such character as to deprive the grantor of the possession and control of the instrument. It does not follow that there has been a delivery of a deed from the fact that at some time it may have been in the possession of the grantee, for at such times it may have come into the hands of the grantee without any intention on the part of the grantor to make a delivery.

3. Evidence—Section 606 Civil Code.—Under Section 606 of the Civil Code, which prevents a party from testifying for himself with reference to statements or transactions had with a party who is dead at the time the testimony is offered, one co-defendant cannot testify for the other where their interests are not severable, and where both must stand or fall together, nor can the husband of one party in such case testify for the other.

4. Deeds—Delivery—Presumption—Burden of Proof.—Where a deed executed by a decedent to his two daughters was found in his possession, locked in his desk with his other papers and the key in his pocket, at the time of his death, the presumption is that the deed has never been delivered, and the burden is upon the grantees to show a delivery.

W. R. CRESS & SON and J. P. HOBSON & SON for appellants.

N. H. W. AARON, JAMES GARNETT, Attorney General, and J. N. MEADOWS for appellees.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

The appellant, Sarah Dunbar, is the widow of Bryan Dunbar, who died in March, 1912. They were married August 24th, 1893, and one child, the appellant, Luther Dunbar, is the only issue of the marriage. Bryan Dunbar had two children by a former marriage, and they are Emma Meadows and Sarah Flanagan, the appellees. He

was a Federal soldier and a pensioner. Prior to his marriage with the appellant, he owned 160 acres of land, worth about $4,000. After his marriage he purchased 31 acres nearby, but this last purchase is in the hills and not very valuable. Moreover, it is not involved in the controversy. Bryan Dunbar commenced paying his respects to the appellant in November, 1892. On June 3rd, 1893, he signed and acknowledged a deed conveying the 160 acres to his two daughters, the appellees, but reserved the right to use and occupy it for life. Two months and 21 days after he signed the deed he married the appellant. When he died, 19 years afterwards, his daughters asserted ownership under the deed. The appellants were permitted to occupy it for a year by paying rent. They then brought this action to have the deed cancelled on the ground that it was made without her knowledge and in fraud of her marital rights, and that it was never, in fact, delivered, and was, therefore, void. The answer controverted these allegations, and set up affirmatively that the marriage was consummated after she had knowledge of the conveyance, and that the deed was duly delivered and appellees accepted it. The lower court sustained appellees' contention and adjudged them to be the owners of the land in question. From this judgment the widow and son appeal.

The daughter, Sarah F., married George W. Flanagan, and moved to Texas, or Oklahoma, a year or so before her father married the appellant, but the daughter Emma, who was about 19 years old when her father married, continued as a member of the family until she married Elbert Meadows. This was near the time of her father's death. The deed in question was not recorded until the 21st day of March, 1912, nearly 19 years from the time it was signed and acknowledged. Mrs. Dunbar testifies that she had no knowledge that the deed had been executed until two or three years after her marriage. One of the neighbor women told her about it, and she lost no time in making inquiry of her husband, and it is clear that from then until his death this was the cause of many bitter family disputes. He was frequently under the influence of liquor, and the relations between Mrs. Dunbar and her step-daughter, Emma, were never very pleasant. Mrs. Dunbar tried repeatedly to have him destroy the deed, and Emma was just as determined that he should not destroy it. It is not de-

nied that Mr. Dunbar was very fond of his son, Luther, and that Mrs. Dunbar was a thrifty, hard-working woman, and often served as a field hand. Mr. Dunbar left practically no personal estate for distribution. Although she is now past sixty, and the effect of a cancellation would operate only to give her a life interest, and make three instead of two remainder interests, still appellees claim that the equities are all against her, and that their father believed that her widow's pension would be sufficient for the support of herself and son. The daughters say that about $800 of their mother's money went into the purchase of the farm in the first place, and that she worked and helped pay for the balance of it. They argue that Mr. Dunbar's purpose in executing the deed was to save to the daughters the amount of their mother's money that went into the place. They do show that she inherited from her father and another relative approximately $800, but there is no competent evidence that Mr. Dunbar took or used any of it in the purchase of the place. In our view of the case, this is not material anyhow. There are but two questions: (1) Did she enter into the marriage with knowledge that the deed had been executed? (2) Was the deed delivered? She denies that she had any knowledge of the deed prior to her marriage. Several witnesses testify about conversations which they heard at the Dunbar home at sundry times when the family were quarreling about the deed. At such times they say she admitted that she knew before the marriage that the deed had been executed. We are impressed that what they did hear her say was not that she knew it before the marriage, but that she knew at the time of the conversations that a deed had been executed before the marriage. Many facts and circumstances are developed throughout the examination of the witnesses for both sides, showing their extreme prejudice and partisanship.

But, in view of the conflict of the testimony on this proposition, we will not say that the court erred in holding that she knew of the deed before her marriage and, therefore, she will not be heard to complain that it was in fraud of her marital rights.

We are convinced, however, that a preponderance of the evidence shows that the deed never was delivered. It is essential to the validity of a deed that there be a delivery. The question of delivery is generally one of

intention of the parties, and there must be some act or declaration from which an intention to deliver may be inferred, and they must be of such a character as to deprive the grantor of the possession and control of the instrument. It does not follow that there has been a delivery of the deed from the fact that at some time it may have been in the possession of the grantee, for at such times it may have come into the hands of the grantee without any intention on the part of the grantor to make a delivery. 13. Cyc., 560-563. With these general principles in mind, we will now consider the facts developed on the question of delivery. When Bryan Dunbar died the deed was locked up in his desk among his papers, and the key in his pocket. Although Emma Dunbar claims that before his marriage he delivered the deed to her, yet she never took any steps towards recording it until after his death. Within a few hours after his death or funeral, she got the key and had a friend unlock the desk, get the deed, take it to town, and file it for record. She then gives a very feminine and, to her, sufficient reason why she waited until his death, and then got in such a hurry to have it recorded. She was asked: "Q. Why didn't you take it and record it? A. Just because I didn't." She proves the fact of delivery in answer to the following leading question, over appellant's objection: "Q. Before your father married this last time did he deliver to you a deed on behalf of you and your sister? A. Yes, sir." She says this occurred at home, and "he told me to keep it." She admits, however, that she did not keep it. Her father had possession of it most of the time afterwards, but she explains that this was to prevent her stepmother from getting the deed and destroying it. She says that if she, the daughter, left home she took the deed with her, or if he left home he would take it with him; but at all other times it was locked up in his desk. In company with her father, she made two visits to her sister in Oklahoma, and says she took the deed with her each time. This is corroborated by Mrs. Flanagan and Mr. Flanagan.

But the testimony of Mrs. Meadows and the Flanagans is incompetent, because it is self-serving and concerns verbal statements and transactions with one dead when the testimony was offered. Section 606, Sub-section 2, Civil Code. Under this deed, Mrs. Flanagan and

Mrs. Meadows took a joint interest in the 160 acres of land—each had an equal interest in every acre of it. If the deed was delivered to Mrs. Meadows it was a delivery for the benefit of herself and Mrs. Flanagan. Mr. Flanagan was not a competent witness in behalf of his wife, and, because the interest of the wife was not severable from that of Mrs. Meadows, neither was he a competent witness for Mrs. Meadows. For the same reason Mrs. Meadows and Mrs. Flanagan were not competent witnesses for each other, and, of course, neither could testify for herself. If by the testimony of Mr. and Mrs. Flanagan, the fact of delivery to Mrs. Meadows be established, then it necessarily inures to their benefit also, and the testimony is, therefore, for themselves. The rule is thus stated in 40 Cyc., 2334:

"A party cannot testify in favor of a co-party where the interests of the co-parties is joint and so connected that all must succeed or fail together; but one co-party may testify for another while their interests are several and not joint, and are so distinct that the testimony of the witness in behalf of his co-party does not inure to his own benefit."

In applying Section 606 of the Code this court, in Beach v. Cummins, 13 Ky. L. R., 881, 18 S. W., 360; Story v. Story, 22 Ky. L. R., 1731, 61 S. W., 279; Schonbachler v. Mischell, 121 Ky., 498, 28 Ky. L. R., 460, 89 S. W., 425, held that a party, although incompetent as a witness for himself about a transaction with a decedent, might, for the benefit of a co-party give such evidence, but these cases are based upon the fact that the interest of each was severable and distinct. The case of Barnett's Admr. v. Adams, 26 Ky. L. R., 622, is in point. It concerns a transaction with a decedent where the parties, whose testimony was offered, were jointly interested in the thing in controversy, and the court drew a distinction between that case and the ones above referred to. The lower court had sustained objections to the testimony on the idea that is was for self. In approving that ruling this court said:

"It is insisted that each of them was a competent witness for the others, although his testimony as to these matters could not be considered in his own behalf. (Beach v. Cummins, 13 Ky. Law Rep., 881; Story v. Story, 22 Ky. Law Rep., 1731; Dovey v. Lam, 25 Ky. Law. Rep., 1157.) But none of these cases are in point.

Here the parties were jointly claiming the Piles tract of land. They were joined necessarily as parties plaintiff, in the cross-petition. One could not succeed if the others failed on the merits of their claim. They all stood or fell together, according as the trust was made out or not by the evidence. Their interest being joint and not several, one of them was not competent as a witness for the others.'' See also Henning v. Stevenson, 118 Ky., 318, 26 Ky. L. R., 159.

In the Henning case, *supra,* a will was assailed on the ground of mental incapacity and undue influence. The court said:

"The wife of one of the contestants was offered as a witness for them. The court refused to allow her to testify, and of this they complain. By Section 606 of the Civil Code of Practice, neither a husband nor his wife shall testify for the other in actions of this character, except in actions which might have been brought by or against the wife if she had been unmarried, and in such actions either, but not both, of them may testify. The wife had no interest in the case, and, if she had been unmarried, might have testified. But the meritorious cause of action was in the husband and not in her, and it was not one of those cases in which either the husband or wife may testify. Those are the cases where the meritorious cause of action is in the wife. Wise v. Foote, 81 Ky., 10, 4 R., 643. It is insisted, however, that, though she could not testify for her husband, she might testify for the other contestants. It has been held that where the defendants are severally liable, and separate judgments may be rendered as to each, the wife of one is competent for the others. Dovey v. Lam, 117 Ky., 19, 77 S. W., 383, 25 Ky. Law Rep., 1157. But a will contest is not a case of this sort. The admissions of one devisee are competent against all the devisees, because they have a common interest in the same question, and must stand or fall together, being thus consolidated by their testator, and by their own act in claiming under his will. Beall v. Cunningham, 40 Ky., 399; Rogers v. Rogers, 41 Ky., 324; Gibson v. Sutton, 70 S. W., 188, 24 Ky. Law Rep., 868. The question to be determined here was, whether the paper was the will of the testatrix. All the contestants and all the contestees must stand or fall together. The judgment establishes a status which determined all their rights. The interest of one could

not be separated from the interest of others. The wife of one of the contestants or devisees was not, therefore, a competent witness for her husband, or for any of the other parties joined with him as contestants or contestees. Wise v. Foote, 81 Ky., 10, 4 R., 643; Williams v. Williams, 71 S. W., 505, 24 Ky. Law Rep., 1326.''

The only competent testimony on the question of delivery comes from Agnes Flanagan, the daughter of George W. and Sarah F. Flanagan, and it falls far short of establishing it. She tells of a visit of Emma and Bryan Dunbar to the home of her parents in Oklahoma in 1906. These questions were asked her: ''Q. You will examine the deed attached to these interrogatories from Bryan Dunbar to Sarah F. Flanagan and Emma E. Dunbar, and state whether or not you saw this deed on the visit to your home by Bryan Dunbar and Emma Dunbar, and if you say that you saw the deed, you will please state who had possession of the deed, and who else saw it in your presence? A. Yes, I saw it on that occasion. Aunt Emma Dunbar had the deed. My grandfather, my mother and father. Aunt Emma had the deed. Q. Did anyone read this deed on that occasion, and if so, who read it in your presence and who heard it read in your presence.'' No answer. There is nothing in this testimony to indicate that the deed was not under control of Mr. Dunbar or that it was actually out of his possession. It is admitted that the deed was in his possession at the time of his death, and the presumption is, therefore, that he had never delivered or surrendered possession of it. Leaving out of consideration the testimony of the daughters and husband, because it is incompetent, we are of opinion that the appellees have wholly failed to show a delivery of the deed.

In Myers v. Brown, 110 S. W., 402, this court said: ''Where a deed to land was never delivered to the grantee, but remained in the grantor's possession and was found among his papers after his death, it passed no estate.''

See also Bell v. Farmers Bank of Kentucky, 11 Bush, 34, 21 American Rep., 205; Jefferson County Building Association v. Heil, 81 Ky., 198, 13 S. W., 1070; Coyler v. Hyden, 94 Ky., 180; Koger v. Koger, 92 S. W., 961.

In the Coyler case, *supra,* Coyler executed deeds to some of his heirs, about three weeks before his death

He handed one of the deeds to his wife with instructions to put it away, or take care of it for him. After his death his wife got the deed and gave it to the grantee. The court held the deed invalid for non-delivery. It was like the deed in this case in that he reserved a life estate and occupation of the place. The court said:

"The fact that the grantor had retained a life estate in the property, or may have thought that the delivery of the deed would be of no service to the grantees did not dispense with the necessity of delivery." Munro v. Bowles, 54 L. R. A., 865, 187 Ill., 346.

A few weeks after Mr. Dunbar died Mrs. Dunbar detailed all the particulars of it in a letter which she wrote to Mrs. Flanagan. After telling of the occurrences at his death bed, she writes that he said:

"He wanted Luther to tend the land. It is with you two girls about the land. You or George ought to come to his sale and see about your farm. Of course, he did not leave me or our baby boy any land or money. I pray God will help us to make a living. * * * It is farming time, me and Luther has to make our living by our hard work. If you two girls wants us to stay here let me know."

The appellees lay great stress on this letter, and the further fact that they did rent the place to Mrs. Dunbar. There is no plea of estoppel, and the letter could not be given that effect if there had been such a plea. It raises no new issue. She had known for many years that Mr. Dunbar executed the deed. At the time the letter was written the deed had been recorded. The letter could only serve to affect her credibility as a witness, but there is really no inconsistency between her testimony and the statements in the letter. The deed was executed. This she admits, and she thought, of course, that it deprived her of any interest in the land.

For the reasons stated, the judgment of the lower court is reversed, with directions to enter judgment cancelling the deed.