ESTEY ET AL., RESPONDENTS, v. HAUGHIAN, APPELLANT.

(No. 8,120.)

(Submitted January 30, 1941. Decided March 26, 1941.)

[113 Pac. (2d) 325.]

38

*Mr. Earle N. Genzberger* and *Mr. George W. Richardson,* for Appellant, submitted a brief, and argued the cause orally.

*Mr. H. L. Maury* and *Mr. A. G. Shone,* for Respondents, submitted a brief; *Mr. Maury* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Plaintiffs, as the heirs of Harriet Estey, deceased, and Eleanor Cloke, as administratrix, brought this action to remove a cloud on the title to certain described real property in Butte, alleged to result from a deed dated November 21, 1927, and allege, among other things, that after the death of Harriet Estey in May, 1934, defendant placed the deed of record, purporting to be signed by Harriet Estey, conveying the property in question to him. They further allege this deed to be void for the reason that Harriet Estey was insane at the time of its execution. They further allege that it was procured by undue influence on the part of the defendant, that it was without consideration, and that it was never delivered to defendant during the lifetime of Harriet Estey. The complaint asked that the deed be declared void, and that plaintiffs have possession of the property and recover the rental value thereof during the time that it was in possession of defendant.

The answer is a general denial but admits that defendant placed the deed of record. It also contains an affirmative defense or cross-complaint, the substance of which is that defendant furnished most of the money used to acquire the property in question, and alleges that defendant and Harriet Estey were and ever since October, 1916, until her death have been husband and wife, and alleges that defendant is the owner of the property. The reply puts in issue the material allegations

of the answer and cross-complaint, and alleges an affirmative defense to the cross-complaint to the effect that defendant is estopped from contending that he and Harriet Estey were ever married by reason of the fact that he asked for letters of administration of her estate on the theory that he was the surviving husband and that the court denied the application and appointed plaintiff Eleanor Cloke as administratrix, and that the order of the court has become final.

The cause was tried to the court without a jury, and the court found that the deed made by Harriet Estey to the defendant is void, and ordered the same expunged from the record and ordered the property to be delivered to the administratrix and awarded judgment to the plaintiffs for rental. Defendant has appealed from the judgment.

The point determinative of the case is whether the deed of November 21, 1927, is void for any of the reasons contended. There was no evidence to support the allegation that the deed was executed as a result of undue influence, hence that feature of the case may be eliminated from consideration. As to the failure of consideration, the evidence is without dispute that defendant ever since 1916, and up to the time of her death, lived with Harriet Estey as if they were husband and wife. Whether the relationship constituted a common-law marriage we need not determine. Suffice it to say that, so far as consideration is concerned, defendant furnished most of the money with which to acquire the property in question. The initial or down-payment of $1,200 was paid by each furnishing $600. Defendant from 1916 until the death of Harriet Estey was employed in the mines in Butte and turned over all his earnings, amounting to more than $16,000, to Harriet Estey, and from them payments were made on the property in question. During the World War he served in the army and made to her monthly payments of $18 per month during that period. This evidence is without dispute, and to say that the deed was executed without consideration finds no support in the record.

As to delivery of the deed, the evidence is without dispute that, when it was executed, it was handed by Harriet Estey

to the defendant, and that she said to him at the time, "Here is your deed. Go and do whatever you want to. Put it on record or do whatever you want to." Ever since its execution and delivery, the deed has been in the possession of the defendant and, hence, we see no basis for the contention that the deed was never delivered. (Compare *Sylvain* v. *Page,* 84 Mont. 424, 276 Pac. 16, 63 A. L. R. 528; 8 R. C. L. 999; *Plymale* v. *Keene,* 76 Mont. 403, 247 Pac. 554.)

The only remaining ground for asserting that the deed was void, and the one that is principally relied upon, is that Harriet Estey at the time of its execution was insane and mentally incompetent to transact business. In considering this question we shall briefly review the evidence relied upon.

Harriet Estey was the wife of John Estey until April, 1912, when they were divorced. The plaintiffs are the offspring of that marriage. Some time before the divorce was granted the relationship between John and Harriet was strained. It seems that Harriet accused John of paying attention to other women. Some time before the divorce was granted she met him on the street and shot him. The wounds inflicted were not fatal. There was evidence also that she, on different occasions, took the mattress from her husband's bed and placed it in the rain and mud, and took an axe and chopped his folding bed. There is evidence, also, that she drove one of her sons and her daughter from the home. There is evidence that before she was divorced from John Estey, Mrs. Estey was seriously ill and had been given up by the attending physician, but that she was restored to consciousness and that she thereupon stated that she had been in a beautiful place and expressed regrets that "they did not let her go." She repeated this vision many times thereafter. These and other acts which may be considered symptoms of paranoia all occurred prior to 1916. Plaintiffs produced her family doctor who attended her when the children were born and occasionally thereafter, and he gave it as his opinion that she was suffering from delusional insanity. He stated that he thought it problematical or doubtful whether it was curable or not. He said that he had advised Mr. and Mrs. Estey and one

of the children that she should be confined in Warm Springs because he regarded her as dangerous to the family and her friends. This advice was given before she shot her husband. One of the plaintiffs, Howard Estey, testified that the doctor made this recommendation to him. He replied as follows: "Doctor, you wouldn't advise me to do anything like that to my own mother?" The reply was: "I will tell you, Howard, a lot of people got a horror of an insane asylum but the insane asylum is just like a hospital. They are treated down there and there may be a chance with your mother with the right environment and regular hours and proper care and medicine that she would come out of it."

The record discloses that Mrs. Estey and defendant commenced living together as husband and wife in the year 1916, under her proposal that they do so. Neighbors and friends testified that they lived happily and peaceably together, and that she was then in a normal state of mind and amply able mentally to transact business, and that she held membership and an important office in a national woman's organization.

Plaintiffs also rely upon the cross-examination of Dr. James, a witness called by defendant and who on direct examination had testified that Mrs. Estey was sane from the time he first treated her in January, 1933, until her death. On cross-examination he admitted that one of the symptoms of paranoia is a homicidal intent; that the destruction of property without cause, headaches and delusions of persecution by one's own family are also symptoms of paranoia; that paranoia is looked upon as incurable by the medical profession, when it is firmly developed. On redirect examination, however, the doctor testified that a paranoiac would not be able to transact business in a normal way and successfully over a long period of time, such as eighteen years as was done by Mrs. Estey, and that when he treated her in 1933 he found no evidence of paranoia, other than nervousness which is found in cases other than paranoia.

We must in this case determine from the record what the mental condition of Mrs. Estey was in November, 1927, at the time the deed in question was executed. In doing so we

keep in mind the well-established rule that if there is any substantial evidence to support the judgment of the trial court, its findings will not be interfered with. The evidence, however, of mental incapacity is all directed to a time long prior to 1927. It is true that Dr. Moore testified that he saw Mrs. Estey occasionally after she shot her husband, but whether he had occasion to treat her in the year 1927 does not appear. While he gave it as his opinion that it was problematical about her ailment being curable, nevertheless there is evidence by the plaintiff Howard Estey that the doctor told him, in substance, that with proper environment there was a chance that she might "come out of it." All of the evidence in the record relating to the time after her associations with the defendant indicates that he furnished the proper environment. At any rate, after she lived with the defendant the evidence shows without conflict that she was of sound mind and able to transact business. If we concede that Harriet Estey was incompetent at and prior to the time she shot her husband and at the time she did the other things indicating a lack of rationality, we still must find from the record that in November, 1927, when the deed in question was executed, the evidence shows she was of sound mind, and the record is barren of any evidence that at that time she lacked capacity to make the deed.

Contention is made that the mere fact that she lived with the defendant under the circumstances under which she did, and at the time when she had grown children, is itself sufficient to show a lack of mental balance. This may be true but yet not sufficient to show a lack of capacity to understand what she was doing with respect to her property. The test which we must apply here is stated in 18 C. J. 218, as follows: "A deed will be invalidated by mental incapacity on the part of the grantor. In order, however, to render a deed void on this ground it should appear that the grantor was laboring under such a degree of mental infirmity as to make him incapable of understanding the nature of the act, the test being not merely that the grantor's mental powers were impaired, but whether he had sufficient capacity to understand in a reasonable manner

the nature and effect of the act which he was doing. Where such capacity exists, mere weakness or infirmity of mind will not, in the absence of fraud or undue influence, invalidate the deed. Nor is a person deprived of the capacity to convey by reason of the fact that his conduct and sentiments are contrary to good morals, or by reason of the fact that his habits have changed from good to bad or indifferent.''

The record discloses that after this deed was made defendant ▮ executed a deed to the same property to Harriet Estey which deed was placed in her possession and retained by her until her death. Plaintiffs contend that thereby defendant reconveyed the property to Mrs. Estey and that therefore he has no interest therein. The evidence discloses that this deed was not to take effect until death, and not then unless defendant died first. Since Mrs. Estey died first, that deed never became operative.

Contention is also made that the moneys advanced by defendant toward the purchase of the property should, on the record, be treated as gifts to Mrs. Estey. This contention does not find support in the evidence.

Finding no basis for the finding and judgment of the trial court, the judgment appealed from is reversed and the cause remanded with direction to enter judgment for the defendant.

Mr. Chief Justice Johnson and Associate Justices Erickson and Morris concur.

Mr. Justice Anderson, Dissenting:

I think the judgment of the lower court should be affirmed. The case presents a state of facts over which anyone would ponder before reaching a conclusion. And there is room for doubt on either side. The district judge heard the case without a jury and found for the plaintiff. Unless we can say that there is a decided preponderance of evidence against such finding the judgment of the district court should not be disturbed. (*Roman* v. *Albert,* 81 Mont. 393, 264 Pac. 115.)

The ultimate question in this case is whether title to the real property in question vested in Haughian at the time of the death of Harriet Estey. He claims under a deed from her. The appellants, her heirs, claim that the deed is void for want of consideration and for want of mental capacity in Harriet Estey at the time it was executed, and also that there never was delivery of the deed so as to give it effect.

The relations between Haughian and Harriet Estey were unusual and extraordinary, and the circumstances under which the acquisition of the property by her evolved, and the circumstances of the execution of the deed to Haughian, all are such as make it difficult to draw therefrom the light needed to discover and determine any contractual relation between the parties by which either of them might be bound.

Haughian's first acquaintance with Mrs. Estey was at a time when there was trouble in the family in the course of which she shot her husband. The husband was a mine laborer employed in the mines in Butte where they lived. For several years Mrs. Estey had been in an abnormal state of mind and hard to get along with. She quarreled with all the family and displayed fits of temper and rage making the family life as it was unbearable. The oldest boy had fled and never returned. The other boy married when he was eighteen and the father had gone to live with him. The younger daughter, seven years old, alone was living with the mother. The family physician had recommended that Mrs. Estey be placed in the State Hospital for the Insane. During all of this family trouble Haughian was living with the grandmother, all living in the same part of town. At the grandmother's Haughian says he first met Mrs. Estey. That, he says, was in 1912, about the time she was divorced from her husband, and about a year after the shooting. After that he saw her occasionally and called on her at her house and at times helped her with some work about her place. The younger daughter she had driven away so she was then all alone. In the latter part of 1915 Haughian helped her get started in a small boarding house she was taking over. Shortly after that he moved in with Mrs. Estey and they decided to

live together as man and wife without being married, and so they did. Haughian testified that Mrs. Estey told him she did not believe in marriage because she was married once and it proved a fizzle and a fraud. She was already an aging woman, then about fifty years old, had been sick and had suffered from mental derangement throughout a long period of time. Haughian was then twenty-eight years old, right in the prime of life.

Mrs. Estey had some property. She was in the rooming house business. According to Haughian's own testimony, she was able to lay down $600 as part of the purchase price when the property in question was bought, and there was income from the property and the business she conducted that was thereafter used in taking care of the installment payments. It was at about the time when this property was bought that Haughian became interested and moved in with Mrs. Estey. They lived together after that for seventeen years. During that time Mrs. Estey ran the property—a rooming and boarding house, the title and all business transactions in connection with the property being carried in her name—and Haughian lived with her.

He testified that during that time all his earnings—he was a mine laborer—he turned over to Mrs. Estey, and he shows the amount of his contributions by showing his total earnings. A statement from his employers covering a period of thirteen years of that time shows his average earnings to have been $119 per month. He says nothing of what his personal expenditures may have been. He mentions several trips to California during that time. Mrs. Estey, he said, went to California five or six times and he went there with her a few times himself. One time they stayed about a year in California. He mentions driving there in a car. And there were trips made to other places. All this must have taken considerable money. There is no definite information. Also Haughian testified that he got some property from Harriet Estey which she inherited from her father and mother, consisting of three lots in Idaho Falls. He said he bought it from her and she deeded it to him in 1921. Also he mentioned dealing with her for some prop-

erty in California but that the deal fell through on account of fraudulent transactions by the people they were dealing with and the deed he said never was recorded.

In the purchase of the property now in question, the contract was between Mrs. Estey and the property owner. And when it was paid for a deed conveying it to Mrs. Estey was delivered to her and recorded. Even though Haughian had contributed a considerable part of the purchase price, the title would be absolute in her under the circumstances as here shown. The rule is that if one purchasing property and paying the price has title made to another in close relationship or who may have some claim upon his bounty, the presumption is that it is intended as a gift. (Pomeroy's Eq. Juris., 4th Ed., section 1039; *Clary* v. *Fleming*, 60 Mont. 246, 198 Pac. 546.) The facts and circumstances here are not such as to overcome that presumption with respect to any contributions which Haughian may have made in the transaction. If we take Haughian's own testimony as to the relations between himself and Mrs. Estey, the rule is clearly applicable.

Then as to the deed from Mrs. Estey to Haughian. This is dated November 21, 1927, and was recorded May 19, 1934, the day after Mrs. Estey's death. The only direct evidence we have as to any of this transaction is the testimony of Haughian. He said the deed was delivered to him the day it was made and that Mrs. Estey told him then to take it and record it or do anything he wanted with it. Then he further testified that there was another deed executed two or three days later, a deed whereby he conveyed the property to Mrs. Estey. On cross-examination he said that there were two deeds executed at that time, which was two or three days after the first deed from Mrs. Estey to him was made. The two later deeds were one signed by Haughian conveying the property to Mrs. Estey and a deed signed by Mrs. Estey conveying the property to him. So that there were three deeds executed about the same time. Haughian says that the purpose was to fix it so that when one of them died the survivor would become the owner of the property. The two later deeds, he said, were in

Mrs. Estey's possession until her death. They were in a tin box that was in her keeping.

While the case as made by the pleadings deals with the first deed alone, an action to remove it as a cloud upon the title, the defendant himself at the trial injected into the case the two later deeds and counsel on both sides made it a material part of the inquiry. And while they may not be considered as effecting a transfer of title for the purpose of this case, the execution of these deeds, occurring shortly after the first deed, and the disposition and custody of them, with Haughian's own explanation of the purpose, all should be taken into account, together with other circumstances, in determining whether there was delivery of the first deed such as to transfer title from Mrs. Estey to Haughian.

As to the first deed from Mrs. Estey to Haughian, he said he kept it in a tin box which was his own and which he had in the house. At one time when they were on a trip to California they buried the box in the ground outside the house for safe keeping, the box containing also other valuable papers. They both together buried it and both together unearthed it upon their return. Asked whether she ever got that deed back, he answered: "It was there if she wanted it. Q. In whose drawer was it? A. My drawer and if she wanted it she could have it." This does not lead to a belief that Haughian had received that deed by an absolute delivery thereof to him so as to effectively convey the title. It gives rise to a grave doubt on that point.

Then as to the two later deeds. On cross-examination Haughian testified that there were two tin boxes instead of one, which they buried in the ground in the same hole when they went away to California in the fall of 1931, and which they both together dug up when they returned in 1932. On direct examination he testified that he had made a deed to Mrs. Estey, in explanation of which he said, "Well, I made a deed in case anything would happen to me; that anything I had no other body would interfere between us and anything I had would go to her. * * * I had a deed and she had a deed. We both

had a deed. I made one out to her to protect her and she made one out to protect me. \* \* \* The agreement was if anything happened we had those other deeds made out, and if anything happened to one the other one was to put it on record. If anything happened to her I was to put it on record and if anything happened to me she was to do the same."

Mrs. Goggins, a long time friend of Mrs. Estey, called as a witness for Haughian, told of a conversation she had with her regarding her relations with Haughian and with respect to property affairs, and said Mrs. Estey had told her: "If she should pass away her interest in what she had was to pass to Hugh Haughian and if he passed ahead of her his interest would pass to her."

Haughian testified that a few days after Mrs. Estey died, and when he had recorded the first deed, he burned the other two deeds, and that he had not told anyone, not even his own lawyer, anything about the two deeds that he burned.

It is difficult to determine what the parties intended the condition of the title to be. Haughian says the intention was to have it so that upon the death of one the survivor would get the property and it was to then be effected by the recording of one of the two later deeds by the survivor. But the two later deeds were at all times in the possession of Mrs. Estey until her death. And the first deed, he says, was kept where Mrs. Estey could always get it and that if she wanted it she could have it. This makes it appear that Mrs. Estey had control over all the deeds up to the time of her death. She held the title to the property other than as it may have been affected by these deeds.

Mrs. Estey, it appears to me, was mentally competent when she executed the deed to Haughian, and the evidence does not show any undue influence over her by Haughian. She had the right to give the property to him if she chose to do so, and also there was testimony of contributions made by Haughian. So that the question of competency of the grantor, and the question of consideration, are both out of the case, and as to that I am in accord with the majority opinion of this court. But

I am at variance with the majority view on the question of delivery of the deed.

The purpose of a deed in the transfer of real property is as a means of making certain the fact of transfer and as evidence thereof which may thereafter be relied upon. But the execution of the deed alone is not sufficient. There must be delivery of the deed coupled with the intent to transfer the title at the same time in order to give it effect. Effort has been made by legislative enactment to surround the execution of deeds by certain requirements such as will lend certainty to the transaction—it must be in writing signed by the grantor, also provision is made for acknowledgment, which is thereafter accepted as proof of execution. While the due execution of a deed raises a presumption of its delivery (sec. 6844, Rev. Codes), delivery is essentially an act separate and apart from its execution, and when the facts are shown they must be considered together with the attendant circumstances. What shall be sufficient to establish delivery it is impossible to state in exact terms that would be determinative in all cases. A rule which has general application is stated in 16 Am. Jur. 501, section 115, as follows: "The intention of the parties, particularly the grantor, is an essential and controlling element of delivery of a deed. It has been called the 'essence of delivery,' and not only is often the determining factor among other facts and circumstances, but is the crucial test where constructive delivery is relied upon. Categorically stated, the rule is that it is essential to the delivery of a deed that there be a giving of the deed by the grantor and a receiving of it by the grantee, with a mutual intention to pass the title from the one to the other."

There are enough circumstances here to justify the conclusion that upon the execution of the deed, and taking Haughian's statement that it was handed to him by Mrs. Estey to do with it what he wanted as true, still they did not then consummate the transfer of the title. What followed would indicate that they both concluded that the transfer of title should be held in abeyance so long as they were both living and that it would be

handled by the execution of other papers. The deed was not recorded until after the death of the grantor, seven years after it was executed. The deed was left in a place where Mrs. Estey had access to it, and where Haughian himself says she could have it any time she wanted it.

Another deed from Mrs. Estey to Haughian was executed a few days after, together with a deed from Haughian to Mrs. Estey, both of which were left in Mrs. Estey's possession and retained by her until her death. The property continued to be handled in the same way as before, in Mrs. Estey's name, in the county recorder's office, on the tax rolls and in all dealings with the public.

The following cases are cited to show that circumstances such as here disclosed are given weight in determining the question of delivery: *Roman* v. *Albert,* 81 Mont. 393, 264 Pac. 115; *Hayes* v. *Moffatt,* 83 Mont. 214, 271 Pac. 433; *Hayes* v. *Boylan,* 141 Ill. 400, 30 N. E. 1041, 33 Am. St. Rep. 326; *Ball* v. *Sandlin,* 176 Ky. 537, 195 S. W. 1089; *Dunbar* v. *Meadows,* 165 Ky. 275, 176 S. W. 1167; *Stone* v. *Daily,* 181 Cal. 571, 185 Pac. 665; *Kenney* v. *Parks,* 137 Cal. 527, 70 Pac. 556.

And a further matter to be considered is the quality of the evidence—the testimony of Haughian the survivor of the two persons in the transaction. Such testimony is the least satisfactory of all evidence. It might have been excluded as incompetent. (Sec. 10535, Rev. Codes.)

The court made no special findings of fact, just a general finding of the issues in favor of the plaintiff, and we do not know on which of the grounds contended for by the plaintiff that the judgment is based. But assuming that it was based upon the question of delivery of the deed alone, the trial judge must have found that there was not a delivery sufficient to pass title and that as a result of the execution of the deed, and what was done with it thereafter, title was not divested but remained in Mrs. Estey and was vested in her at the time of her death. I do not believe that upon all of the facts and circumstances of the case we can say that the trial court was in error in reaching that conclusion.

For the reasons I have pointed out herein, I am unable to agree with the majority opinion and I therefore dissent.

Rehearing denied May 28, 1941.