The **SUPERIOR OIL COMPANY, a** corporation, Plaintiff,

v.

Edward **VANDERHOOF, a single man, Orval Vanderhoof, a single man, Richland County, Montana, a quasi municipal corporation, Tribal Drilling Company, a partnership, Bright & Schiff, a partnership, J. C. Cottingham and Mrs. J. C. Cottingham, husband and wife, et al., Defendants.**

**Civ. No. 724.**

United States District Court
D. Montana,
Billings Division.
March 17, 1969.

Habedank, Cumming & Best, Sidney, Mont., for Edward Vanderhoof and Orval Vanderhoof.

Kurth, Conner, Jones & Davidson, Billings, Mont., for Bright & Schiff and Tribal Drilling Co.

## ORDER AND OPINION

JAMESON, District Judge.

Plaintiff, lessee in an oil and gas lease, instituted this action pursuant to the Federal Interpleader Act.[1] The defendants have or claim landowners' royalty interests in the oil and gas produced from the land under lease. Plaintiff's motion for interpleader was granted in an order entered October 11, 1968.[2] Thereafter the defendant Bright & Schiff moved for summary judgment against the defendants Edward and Orval Vanderhoof. This motion was denied by order and opinion filed November 20, 1968.[3]

The Vanderhoofs are record owners of 1040 acres of land in Richland County, Montana. 280 acres were obtained by conveyance from defendant Richland County in 1940 and 1943, the county reserving a six and one-fourth per cent royalty interest. By two deeds dated December 17, 1953, the Vanderhoofs conveyed to defendants J. C. Cottingham and Mrs. J. C. Cottingham a one per cent royalty interest in the 280 acres.

The 1040 acres were leased to I. H. Cunningham under an oil and gas lease dated April 20, 1962. This lease was assigned to plaintiff on May 22, 1962. It provides for the payment of a one-eighth or 12½ per cent royalty of all oil and gas produced from the 1040 acres and contains an "entireties clause" providing that the property may be developed as one lease and royalties paid to separate owners in the proportion that the acreage owned by each separate owner bears to the entire lease acreage.

By warranty mineral deed dated September 13, 1965, the defendants Edward V. Vanderhoof and Orval Vanderhoof conveyed to Rex H. Baker

"an undivided ......One-Half (1/2)...................................... interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described lands situated in ...........Richland........................................ County, State, ......Montana.............................., to-wit:

Township 25 North, Range 58 East
Section 13: E½
Section 24: NE¼SE¼
Township 25 North, Range 59 East
Section 18: SE¼SW¼, S½SE¼
Section 19: Lots 2,3,4, E½NW¼, NE¼, NE¼SE¼
Section 20: NW¼

It is the intention of the grantors to convey 520.00 mineral acres

containing....1040.00...acres, more or less, together with the right to ingress and egress at all times for the purpose of mining, drilling, exploring, operating and developing said lands for oil, gas, and other minerals, and storing, handling, transporting and marketing the same therefrom with the rights to remove from said land all of Grantee's property and improvements."

By deeds dated October 4, 1965, Baker conveyed an undivided 328.5915 mineral acres to the defendant Tribal Drilling Company and an undivided 191.4085

1. 28 U.S.C. § 1335.

2. This completed the first of the "two stages" of the interpleader action. The case is now in the second stage of interpleader, i. e., the contest among the defendant claimants. See 3A Moore's Federal Practice para. 22.14(1) (2) (1968).

3. This order and opinion sets forth in more detail the nature of the entire controversy and the royalty interests in dispute.

mineral acres to the defendant Bright and Schiff.

The present controversy involves the respective rights of the defendants Vanderhoof and the defendants Bright and Schiff and Tribal Drilling by reason of the prior reservation by Richland County in the 280 acre tract and the conveyance of the one per cent royalty interest to Cottinghams.

The issues between these defendants were tried before the court without a jury on January 20, 1969. Both sides have filed post trial briefs. Two questions are presented: (1) whether the mineral deed was ambiguous, permitting parol evidence to explain the intent of the parties, and if so, whether the parties intended the grant of a one-half interest of whatever Vanderhoofs owned or a grant of 520 mineral acres; and (2) if not, whether Vanderhoofs may recover on their cross-claim for fraud and mutual mistake.

With respect to the first question, both parties have relied upon the general rule set forth in 1 Williams and Meyers, Oil and Gas Law, Section 320.2:

"The conflict between a grant of a fractional interest and the grant of mineral acres, in the same deed, may be disposed of in three ways:

"1. The court could declare the deed ambiguous and admit parol evidence. This solution has much to recommend it. There is certainly ambiguity and there is likely to be persuasive parol evidence available, since the deed indicates a bargain (and probably a price) based on mineral acres.

"2. The court could hold the instrument unambiguous and give precedence to the call for a certain number of mineral acres. Assuming the wisdom of excluding parol evidence for lack of ambiguity, we would urge this construction, for it appears more likely that the parties bargained in terms of mineral acres than in terms of fractional interests. The clause calling for mineral acres reflects, we think, a high degree of probability that the purchase price was paid on an undivided acreage basis.

"3. The court could hold the instrument unambiguous and give precedence to the call for a fractional interest. This is the least desirable course, in our view, for the reasons set forth in paragraphs 1 and 2 above."

Vanderhoofs argue that the deed in question is ambiguous, that the first alternative should be followed, and that the parties intended a grant of one-half of whatever interest Vanderhoofs owned. Bright and Schiff and Tribal Drilling argue that there is no ambiguity, that the second alternative should be followed, and that in any event, the parties intended a grant of 520 mineral acres.

No case has been cited which is precisely in point. Two cases cited in the 1968 supplement to Williams and Meyers, however, lend support to the contention of Bright and Schiff and Tribal Drilling that the conveyance calls for 520 mineral acres. In El Paso Natural Gas Company v. Kelly, 10 Cir. 1962, 308 F.2d 820, 823, in holding the number of mineral acres controlling, the court said in part:

" * * * The plaintiffs' mineral acres must be related to the total mineral acres, and they are not changed by variations in Hudson's total mineral acres. One of the reasons for describing an interest in terms of mineral acres is to protect the grantee against the possibility that the grantor's interest may be smaller than was contemplated at the time of conveyance. 1 Kuntz, Law of Oil and Gas § 16.3, at 381 (1962); 1 Williams and Meyers, Oil and Gas Law § 320.2, at 665 (1959). We agree that Hudson only owned one-half, or 3150, of the 6300 mineral acres, but this fact does not serve to reduce the plaintiffs' 660 mineral acres. Its only effect is to increase the plaintiffs' percentage of Hudson's interest."

In Wade v. Roberts, Okl.1959, 346 P.2d 727, 729, the court construed a deed granting 32 acres and containing the reservation of "an undivided $\frac{5}{32}$ interest amounting to an undivided five (5) acre interest" in the mineral rights. By reason of the accretion of land, $\frac{5}{32}$ of the tract amounted to 7.385 instead of five acres. In holding that the deed was not ambiguous and that the reservation was limited to five acres, the court said in part:

> " * * * The term 'amounting to' as used herein means 'to rise or reach to, by an accumulation of particular sums or quantities; to come to in the aggregate or whole.' It is apparent, not only from the above expression but the whole contract or deed, that at that time it was the purpose and intent to limit the amount reserved to an undivided five-acre interest in the minerals of the lands conveyed." (346 P.2d 729).

Most of the cases cited in Williams and Meyers involve deeds with provisions that would clearly conflict if the acreage differed from that supposed, i. e., where the grantor in fact owned more or less acres than the acreage specified in the grant (or reservation). Here there is no question regarding the amount of surface acreage owned by the grantors. The ambiguity, if any exists, arises by reason of the fact that the grantors did not own all of the minerals in 280 of the 1040 acres. Nor, by reason of the conveyance of the one per cent interest to Cottinghams, did they own a full one-half interest.

This is not a case where the grantors conveyed an undivided one-half interest in "their" or "our" interest in the minerals in the 1040 acres of land, "consisting of (or amounting to) 520 mineral acres". Under that language it could properly be contended that there is a conflict between the grant of the fractional interest and the grant of the mineral acres, in the event the grantor owned more or less than one-half of the minerals in all or a part of the land. Here, however, the grantors conveyed one-half of *the* minerals in the 1040 acres and the deed expressly recites that, "It is the intention of the grantors to convey 520.00 mineral acres".

It should be noted also that at the time the deed in question was executed, the Vanderhoofs owned a one-sixth mineral interest in another 280 acre tract recently acquired. They executed a deed to Baker in the same form conveying "an undivided One-Twelfth ($\frac{1}{12}$th) interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described lands" (here follows a description of the 280 acres). Following the description of the land these words are typed in: "It is the intention of the grantors to convey 23.34 mineral acres".[4] There is no dispute over what passed by this deed.

There is no ambiguity between the clause conveying one-half of *the* minerals in 1040 acres and the conveyance of 520 mineral acres, and the express provision that a grant of 520 mineral acres was intended would seem to resolve this issue in favor of Bright and Schiff and Tribal Drilling. In other words, this is not so much a conflict between a provision for the conveyance of a fractional interest and a provision for a specified number of mineral acres as it is a failure of title with respect to a one per cent royalty interest in 280 acres. In the absence of the conveyance to Cottinghams, I think it would be clear from the face of the mineral deed that a conveyance of 520 mineral acres was intended regardless of the reservations by Richland County.

In the event an ambiguity could be found by reason of this failure of title, the same evidence must be considered in resolving the question of the intent of the parties and Vanderhoofs' cross-claim alleging fraud and mutual mistake. At

---

4. One-half of the Vanderhoofs' ons-sixth interest $=$ ($\frac{1}{2}$) ($\frac{1}{6}$) (280) mineral acres $=$ 23.34 mineral acres.

the trial all parties to the mineral deed and others who were present during the negotiations and signing of the deed on September 13, 1965, testified, including John Miller, a lease broker who acted as agent for Baker. The testimony may be summarized as follows:

Orval Vanderhoof testified that although he was aware that Richland County and Cottingham held some interests in the 1040 acre tract, he did not know exactly what interest those were at the time of the negotiations with Miller. Nor was he aware that the lease to Superior Oil contained an entireties clause until receipt of a "division paper" dated August 28, 1967, from Superior Oil.[5]

Orval had two conversations with Miller on September 13, 1965, the day the deeds were executed. The first occurred about noon, when Edward was working in the field and accordingly was not present. Orval testified that in this conversation Miller "offered us $30,000 for 1040 acres". Orval said that he was unsure of how much he and his brother would sell and that he had to talk to Edward first.

During the morning of trial, Orval testified that he had not discussed what interests he and his brother owned during this first conversation. After the noon recess, subsequent to the testimony of his brother and sister, Orval was recalled. He stated that "on refreshing [his] recollection during the noon hour", he recalled telling Miller during the first conversation that Richland County probably owned some mineral interest. Orval testified that Miller had said he would "check" on these interests.

Miller returned to the Vanderhoof ranch about 5:30 or 6:00 P. M. Negotiations between the Vanderhoof brothers and Miller, in the presence of two Vanderhoof sisters, culminated in the execution of the mineral deeds. With regard to these negotiations, Orval testified: "Well, I told him I did not know what the county had, how many minerals they had on county land, but I would only sell one-half of what we had left". When Orval was asked whether he read the deed which purportedly conveyed one-half their interest in the 1040 acre tract, he stated, "I read down to where it said one-half".

Edward Vanderhoof testified that he read the entire deed on the evening of its execution, but that "I do not know whether I understood it all or not". In general he confirmed the testimony of Orval. In relating the conversation between Orval and Miller, Edward testified in part:

"Q State what he said. What was said to Mr. Miller at that time and place, in your presence?

"A Well, he asked for $50,000.

"Q Your brother asked for $50,-000?

"A Yes.

"Q For what?

"A For the minerals, half of the minerals.

"Q Would Mr. Miller pay that?

"A No.

"Q What was agreed on?

"A Finally it was agreed on $40,000." (Tr. 59).

" * * *

"A Well, Miller wanted to give $30,000 and we wanted $50,000 and we finally split.

"Q Is that the only conversation?

"A Well, all I can remember anyway of what was said." (Tr. 60).

Gladys Vanderhoof, a sister who was present when the deeds were executed,

---

5. This "division paper" is a letter from the Superior Oil Company to apparent owners of interests in the leased premises, stating the royalty interest, according to Superior Oil computations, of each owner.

testified that she had trouble hearing and that the only portion of the negotiations of which she was aware was that, "They said they would sell half of what they had left, half of the minerals they had left".

All of the witnesses agreed that Miller offered $30,000, the Vanderhoofs asked $50,000, and the parties settled on $40,000.[6]

Miller testified that he could recall little of the negotiations, but that he had believed that both Rex H. Baker and the Vanderhoofs would own 520 mineral acres after the transaction. He had typed in the blanks on both deeds and had also typed in the "intention" clauses that evening.

With respect to his own "intention", Miller testified on examination by counsel for Vanderhoofs:

"Q Was it your intention, Mr. Miller, in purchasing minerals from the Vanderhoofs to purchase one half of the minerals they owned?

"A No, sir.

" * * *

"Q Will you state what your intention was?

"A I think that is clear on the deeds, where I put on it is the intention of the grantors to convey so many net mineral acres." (Tr. 85).

" * * *

"Q Did you have any concern in drawing these instruments as to what if anything an instrument worded as you drew these deeds would leave the Vanderhoofs?

"A Yes.

"Q You thought what?

"A I thought they had fifty per cent of their minerals left.

**6.** It is true, as Vanderhoofs contend, that this would not indicate a specific price per acre. On the other hand, it is unlike-

"Q And that was your understanding at the time you drew these instruments?

" * * *

"A That on the 1040 acre deed we would have 520 net mineral acres. They would have the balance." (Tr. 86).

On cross-examination, Miller testified in part:

"Q I am going to ask you, Mr. Miller, as an oil man, and evidently as an experienced oil man, what difficulties would you have encountered had you attempted to buy one half of what the Vanderhoofs own?

"A With the little checking I had done on the title, and what information was available to me, it would have been practically impossible.

"Q In other words, if they hadn't owned anything, you would have purchased one half of nothing?

"A Right.

"Q Were you at any time ever authorized by Rex H. Baker to purchase one half of what the Vanderhoofs owned under this 1040 acres?

"A No, sir." (Tr. 94).

On the night before he contacted the Vanderhoofs, Miller had gone to an abstractor's office in the area to check existing oil and gas leases. He was not certain whether he had checked the title to the 1040 acre tract of the Vanderhoofs, but he did testify that he had no knowledge of the prior interests of either Richland County or Cottingham at the time of the execution of the deeds.

Payment was made by means of a thirty day draft. Miller testified on redirect as follows:

"Q And the reason for that thirty days was so that the titles could be checked out?

"A Yes."

ly the grantee would pay this amount for an uncertain mineral interest.

The final witness was Rex H. Baker, a lease broker and the grantee under the mineral deed in controversy. He stated that he interpreted the deed to mean that 520 mineral acres had been conveyed to him, the amount he in turn conveyed to Bright & Schiff and Tribal Drilling for a profit. Baker testified that he had "satisfied (himself) of the title", but could not recall exactly what he relied upon.

While Orval Vanderhoof testified that he informed Miller that Richland County had some interest in the minerals (how much he did not know), and that the Vanderhoofs would sell only one-half of what they had left, there is no evidence that any of the Vanderhoofs ever mentioned to Miller any possible interest of the Cottinghams.[7] There is positive testimony from Miller that when he drafted the deed he did not know of any outstanding interests of either Richland County or Cottinghams.

Among numerous exhibits received in evidence were three abstracts of title, which apparently Miller had obtained from the Federal Land Bank of Spokane, memoranda prepared by an abstract company, and title opinions of counsel. Exhibit J–E is an opinion addressed to Rex H. Baker dated September 24, 1965. This opinion sets forth the interest of Richland County, but not the interest of the Cottinghams. Exhibit J–F is another opinion of counsel addressed to Baker dated November 23, 1965.[8] This opinion shows the one per cent royalty interest of Cottinghams as well as the interest of Richland County.

The draft was paid subsequent to the September 24 opinion of counsel but prior to the November 23 opinion. Baker had conveyed his entire interest to Bright and Schiff and Tribal Drilling Company on October 4. Accordingly there is no evidence that Baker, Bright and Schiff or Tribal Drilling had any knowledge of the interest of Cottinghams when the draft was paid. They had been advised that Richland County owned a six and one-fourth royalty interest in 280 acres, but, on the basis of the opinion of their counsel, could assume that the Vanderhoofs still owned a one-half interest in the minerals in the 280 acre tract.

It is well-settled that (subject to certain exceptions) "when a contract has been reduced to writing the contents of such writing cannot be added to, contradicted, altered, or varied by parol or extrinsic evidence, and that such writing supersedes all oral negotiations concerning its matter which preceded, accompanied, or let up to its execution."[9] It is permissible, however, "for the proper construction of an instrument", to show "the circumstances under which it was made, including the situation of the subject of the instrument" (R.C.M.1947, § 93–401–17) or "to explain an extrinsic ambiguity or to establish illegality or fraud". (§ 93–401–13).

When an instrument is free from ambiguity, the "parties being *sui juris*, the courts are not in a position to afford the relief from the effects of unwise or improvident contracts; it being rather their duty to hold the parties to the strict terms of their written agreements * * *"[10] Moreover, "[i]n order for oral testimony to come within the exception, it must not in any way conflict

---

7. The conveyance to the Cottinghams was made some 12 years earlier and may have been overlooked. In any event, there is no evidence that this assignment was mentioned or considered in any way by either party when the deed was executed.

8. This opinion was based on 12 abstracts of title covering various sections of the 1040 acres. The September 24 opinion was based on title memoranda, which apparently did not show the Cottingham assignment.

9. West River Equipment Co. v. Holzworth Construction Co., 1959, 134 Mont. 582, 335 P.2d 298, 302; R.C.M.1947, § 13–907.

10. Biering v. Ringling, 1927, 78 Mont. 145, 252 P. 872, 875, and cases there cited.

with or contradict what is contained in the written contract. The written contract must remain intact after the reception of the parol evidence".[11]

In effect the Vanderhoofs are not seeking to resolve an ambiguity in the mineral deed, but rather to prove an oral understanding at variance with the plain language of the deed. It is my conclusion that the deed is not ambiguous and may not be varied by parol evidence.

Moreover, the defendants Bright & Schiff and Tribal Drilling Company were bona fide purchasers for value. The Vanderhoofs concede that there is no evidence that either of them had any notice of the alleged fraud or mutual mistake, but contend that Bright & Schiff and Tribal Drilling had "notice of the ambiguity of the mineral deed by reason of the conflicting wording on the face of the deed, together with the title opinion from Mr. Sandall dated September 24, 1965." In view of my conclusion that there is no ambiguity in the deed itself and that the September 24, 1965, opinion showed Vanderhoofs to be the owner of at least one-half of the minerals in all of the land conveyed, Bright & Schiff and Tribal Drilling were not required to make any further inquiry regarding Vanderhoofs' interpretation of the deed.

The rules for determining whether a written instrument is induced by fraud are similar to those for determining whether the contract is ambiguous. As a general rule, parol evidence is inadmissible when "the alleged fraud concerns a promise or representation directly at variance with the terms of the written instrument". 32A C.J.S. Evidence § 979, p. 473 (1964). This rule was well stated by the Supreme Court of California in Bank of America Nat. Trust & Sav. Ass'n v. Pendergrass, 1935, 4 Cal.2d 258, 48 P.2d 659, 661, in construing statutes similar to those in Montana. After quoting from IX Wigmore, Evidence § 2439, the court said:

" * * * Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument, or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing. * * * "

This is not a case (1) where the contract itself was ambiguous and required construction; or (2) where a party has made false representations or warranties with respect to the title or condition of property or some other false representation; or (3) where there was an oral agreement relating to a collateral or extrinsic matter not dealt with in the contract itself. There is no evidence that Vanderhoof signed the deed by reason of any false representation or promise made by Miller. The most that can be said is that the agreement did not express the true intent of the grantors. Yet one of them testified that he read the entire deed before signing it and the other that he read to that part "where it said one-half".

It is true, as Vanderhoofs contend, that the deeds were prepared by Miller and that both Miller and Baker are experienced oil brokers. The Vanderhoofs are primarily ranchers and clearly less experienced in the transfer of mineral interests. Inexperience alone, however, does not excuse a landowner from the responsibility of reading an instrument before he signs it, and if he does not understand its provisions, making inquiry of the person who drafted the instrument or having it checked by his own counsel. Vanderhoofs did neither.[12]

---

11. Continental Oil Co. v. Bell, 1933, 94 Mont. 123, 133, 21 P.2d 65, 67.

12. There is no evidence here of any undue influence or lack of mental capacity. See

In a somewhat comparable situation involving a purported failure to reserve the proper amount of minerals, the Supreme Court of Wyoming, in Goodson v. Smith, 1952, 69 Wyo. 439, 243 P.2d 163, 172, quote from 1 Black on Rescission and Cancellation 402, § 131, as follows:

"A party cannot have relief against a contract or other obligation into which he has entered in ignorance of material facts or under a mistake as to such facts, where no fraud or imposition was practised upon him, and his ignorance or mistake is entirely due to his own negligence or lack of proper attention, or to the failure to exercise such reasonable care and thoughtfulness as may be expected in business transactions from men of ordinary care and prudence. Thus, for example, one who is too careless or too confiding to acquaint himself with the contents of a written instrument presented to him for his signature * * cannot ordinarily base a claim to relief in equity on the fact that he was mistaken as to its identity, terms or purport."

It is my conclusion that the Vanderhoofs have failed to establish their defense that the "execution and delivery" of the deed was procured through fraud.[13]

Nor in my opinion is the evidence sufficient to establish mutual mistake. As with ambiguity and fraud, the intention of the parties is to be ascertained from the writing alone, if possible, and "[b]efore equity will intervene to correct a mutual mistake in a written instrument the evidence of the mistake must be clear, convincing, and satisfactory."[14] In my opinion the evidence here fails to meet this test. In any event, as noted supra, Bright & Schiff

and Tribal Drilling Company are bona fide purchasers for value. There is no evidence that they had any knowledge or notice of the alleged understanding that Vanderhoofs were to convey only one-half of whatever minerals they owned.

This opinion shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure. Counsel for the defendants Bright & Schiff and Tribal Drilling Company are directed to prepare, serve and lodge form of judgment consistent with this opinion.

Counsel for all parties are requested to advise the court whether any issues remain to be litigated and determined.

---

R.C.M.1947, § 13–311; Emerson-Brantingham Implement Company v. Anderson, 1920, 58 Mont. 617, 194 P. 160; Estey v. Haughian, 1941, 112 Mont. 36, 113 P.2d 325. Nor is there any suggestion of inadequacy of consideration.

13. For further discussion of proof required to establish fraud see Lee v. Stockmen's

Nat. Bank, 1922, 63 Mont. 262, 284, 207 P. 623, 630; Helena Adjustment Co. v. Claflin, 1926, 75 Mont. 317, 324, 243 P. 1063, 1065; Morigeau v. Lozar, 1928, 81 Mont. 434, 440, 263 P. 985, 987.

14. Humble v. St. John et al., 1925, 72 Mont. 519, 522, 234 P. 475.